[No. S008824. Mar. 26, 1990.]

MUTUAL LIFE INSURANCE COMPANY OF NEW YORK,
Plaintiff and Respondent, v.
CITY OF LOS ANGELES, Defendant and Appellant.

MUTUAL LIFE INSURANCE COMPANY OF NEW YORK,
Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent.

**COUNSEL**

Meserve, Mumper & Hughes and Douglas P. Smith for Plaintiff and Appellant and Plaintiff and Respondent.

James K. Hahn, City Attorney, Pedro B. Echeverria, Richard A. Dawson and Ronald A. Tuller, Assistant City Attorneys, for Defendant and Appellant.

Louise H. Renne, City Attorney (San Francisco), John J. Doherty and Robin M. Reitzes, Deputy City Attorneys, John W. Witt, City Attorney (San Diego), Michael F. Dean, City Attorney (Roseville), Edwin J. Moore, City Attorney (Santa Clara), James G. Rourke, City Attorney (Tustin), and Steven Amerikaner, City Attorney (Santa Barbara), as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, Attorney General, Edmond B. Mamer and Herbert A. Levin, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

PANELLI, J.—Section 28 of article XIII of the California Constitution (section 28) provides generally that insurance companies doing business in California (other than companies issuing title and ocean marine insurance) must pay to the state a tax based on gross premiums. Subdivision (f) of section 28 provides that with the exception of taxes on real estate and motor vehicles, the gross premiums tax is "in lieu of all other taxes and licenses, state, county, and municipal, upon such insurers and their property . . . ."[1] This case presents the issue whether under section 28 an insurance company is exempt from taxes imposed by a city on revenues derived from the rental of an office building and operation of a parking lot owned by the company, and from a tax on use of electric power in the building. A unanimous Court of Appeal held an insurance company is exempt from all taxes except those specified in section 28. For the reasons that follow, we believe this determination was correct and therefore affirm the judgment of the Court of Appeal.

### *Background*

Mutual Life Insurance Company of New York (MONY), a mutual life insurance company licensed to transact business in California, brought suit for a refund of parking lot fee taxes, taxes on rental revenues, and utility users taxes paid to the City of Los Angeles (city) and imposed pursuant to various provisions of the Los Angeles Municipal Code. MONY alleged these taxes were in contravention of section 28 and were therefore void.

The trial was conducted largely on a stipulation of facts entered into by the parties. Their stipulation was that "MONY was subject to taxation by the State of California pursuant to Article XIII, Section 28(f) of the California Constitution. . . . [P]rior to 1980 through 1984 MONY owned two office buildings located . . . in the City of Los Angeles, at each of which it operated an automobile parking facility . . . and engaged in commercial rentals . . . . [¶] From July, 1980 through April, 1984 MONY paid the

---

[1] Section 28 provides in pertinent part as follows: "(b) An annual tax is hereby imposed on each insurer doing business in this state on the base, at the rates, and subject to the deductions from the tax hereinafter specified. [¶] (c) In the case of an insurer not transacting title insurance in this state, the 'basis of the annual tax' is, in respect to each year, the amount of gross premiums, less return premiums, received in such year by such insurer upon its business done in this state, other than premiums received for reinsurance and for ocean marine insurance. . . . [¶] (f) The tax imposed on insurers by this section is in lieu of all other taxes and licenses, state, county, and municipal, upon such insurers and their property, except: [¶] (1) Taxes upon their real estate. [¶] . . . [¶] (5) Motor vehicle and other vehicle registration license fees. . . ."

Section 28 also excepts retaliatory taxes from the "in lieu" provision. (§ 28, subd. (f)(3).)

charges made for the electricity used by its tenants in the two office buildings owned by it." During this period "MONY did not occupy or use any of the office space in either of the two office buildings owned by it."

At trial, Walter K. Korinker, vice-president of real estate investment for MONY, testified that MONY's purchase of the two office buildings was pursuant to an "overall investment plan . . . in the normal course of MONY's investment activities." Mr. Korinker explained that in his experience "investment in real property [is] an activity traditionally associated with the business of life and health insurance."

Following trial, the court rendered judgment against the city and in favor of MONY. The Court of Appeal affirmed. In so doing, the Court of Appeal refused to follow *Massachusetts Mutual Life Ins. Co.* v. *City and County of San Francisco* (1982) 129 Cal.App.3d 876 [181 Cal.Rptr. 370]. We granted review to secure uniformity of decision.

*Discussion*[2]

Our sole task in deciding the issue before us is to determine the meaning of the governing constitutional provision. In approaching this task, we start with established principles of construction, applicable to statutes and constitutional provisions alike. (*County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974, 979 [156 Cal.Rptr. 777]; see *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) ■ "[I]n arriving at the meaning of a [constitutional provision], consideration must be given to the words employed, giving to every word, clause and sentence their ordinary meaning. If doubts and ambiguities remain then, and only then, are we warranted in seeking elsewhere for aid. . . . Among these aids is a consideration of the object to be accomplished." (*State Board of Education* v. *Levit* (1959) 52 Cal.2d 441, 462 [343 P.2d 8].) When, however, "the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) or of the voters (in the case of a provision adopted by the voters). [Citations.]" (*Lungren* v. *Deukmejian, supra,* 45 Cal.3d at p. 735.)

■ In the instant case, we perceive no ambiguity either patent or latent in section 28 that would authorize us to look beyond the plain meaning of the words. Nor, to our knowledge, has any court faced with the issue ever found the provision to be ambiguous. (See, e.g., *Hughes* v. *Los Angeles* (1914) 168 Cal. 764 [145 P. 94]; *Pacific Gas & Electric Co.* v. *Roberts* (1914)

---

[2] We granted leave to participate as amici curiae in support of the city to the City and County of San Francisco and the Cities of San Diego, Roseville, Santa Clara, Tustin, and Santa Barbara. The arguments of amici curiae will be referred to as the city's arguments.

168 Cal. 420 [143 P. 700]; *Hartford Fire Ins. Co.* v. *Jordan* (1914) 168 Cal. 270 [142 P. 839]; *First American Title Ins. & Trust Co.* v. *Franchise Tax Bd.* (1971) 15 Cal.App.3d 343, 346 [93 Cal.Rptr. 177]; *Groves* v. *City of Los Angeles* (1949) 93 Cal.App.2d 17 [208 P.2d 254].) Even in *Massachusetts Mutual Life Ins. Co.* v. *City and County of San Francisco, supra*, 129 Cal.App.3d 876, discussed hereafter, the court implicitly acknowledged that its interpretation, allowing a tax other than those specified in section 28, was contrary to the "plain meaning" of the provision. (129 Cal.App.3d at pp. 881, 883.)

As this court stated when first called upon to apply the almost identical "in lieu" provision then applicable to utilities, as well as insurance companies,[3] "Where is there room for the play of construction upon language so plain as this . . . ? With the argument of respondents, that the framers of this article were intelligent men and must be presumed to know what they meant to say, we are in perfect accord. What they said is so plain, so clear, so free from ambiguity and the possibility of construction as to forbid debate. They declared that the state tax should be in lieu of *all* other taxes and licenses. If they meant that it should be in lieu of but some of those taxes they would have said so. . . . What they did say was that this state tax, with the state's ability to increase it at will, should be in lieu of *all* other taxes and licenses. If argument is required upon the meaning of plain words so clearly expressing an obvious idea, it can only be because of an utter breakdown in our written language in its ability to convey thought." (*Pacific Gas & Electric Co.* v. *Roberts, supra,* 168 Cal. at p. 432, italics in original.)

The city, however, suggests there is an ambiguity in section 28's references to an insurer's "business." Subdivision (b) imposes a tax on each insurer "doing business" in California, and subdivision (c) states that the basis of the tax is the gross premiums received by such insurer "upon its business" done in the state. Subdivision (b), it is argued, could refer to any kind of business done by an insurer, rather than just the insurance business, whereas subdivision (c) with its reference to gross premiums can mean only insurance business.

We are unpersuaded. The tax is on "gross premiums . . . received . . . by such insurer upon its business done in this state." (§ 28, subd. (c).) If the

---

[3] The gross premiums tax and the "in lieu" provision first appeared in former section 14 of article XIII of the California Constitution, which section also established, inter alia, a gross receipts tax and in lieu provision applicable to utilities and railroad companies. As to each, former section 14 declared that the taxes imposed were "in lieu of all other taxes and licenses, state, county, and municipal, upon the property of the corporation in question, subject to certain exceptions, . . ." (*San Francisco* v. *Pacific Tel. & Tel. Co.* (1913) 166 Cal. 244, 248 [135 P. 971]; see also Historical Note, 3 West's Ann. Cal. Const. (1954 ed.) art. XIII, former § 14, pp. 174-175. Former section 14 was amended numerous times and finally repealed in 1974.)

insurer does no *insurance* business here, there are no gross premiums received and section 28 does not apply. If the insurer does insurance business, section 28 does apply and the insurer pays the gross premiums tax on its insurance business. In that case, pursuant to subdivision (f), the gross premiums tax is in lieu of all other state and local taxes and fees, not merely on the *business* of the insurers, but *"upon such insurers and their property."* In other words, doing insurance business that is subject to the gross premiums tax confers upon the insurer a *status* that entitles it to the broad exemption from paying state and local taxes of any kind except real property and motor vehicle taxes and fees. That such was the intent of the electorate is supported by the language and history of the "in lieu" provision.

As originally adopted, section 28 provided that the gross premiums tax was in lieu of all other taxes on the insurer's "property" (except county and municipal taxes on real estate). (See Historical Note, 3 West's Ann. Cal. Const., *supra*, art. XIII, former § 14, p. 175, col. 2.) In 1933 the electorate amended the provision to provide that the gross premiums tax was in lieu of all other taxes on *"such companies or their property."* (Italics added.) (Historical Note, 3 West's Ann. Cal. Const., *supra*, art. XIII, former § 14, p. 178, col. 2, par. 2.) In 1942 the electorate again amended the provision to its present form, which provides that the tax imposed is in lieu of all other taxes "upon such insurers *and* their property." (Italics added.) (See Historical Note, 3 West's Ann. Cal. Const., *supra,* art. XIII, former § 14 4/5, pp. 205-206; see now § 28, subd. (f).) As this court recognized in *Pacific Gas & Electric Co.* v. *Roberts, supra,* 168 Cal. 420, "as in the case of every tax and upon whatsoever form or kind of property it may be laid, in its essence, it is a tax upon the owner of the property." (*Id*. at p. 430.) By these amendments, therefore, the electorate assured the broadest possible exemption for insurance companies subject to the gross premiums tax.

Even assuming, however, that section 28 requires "interpretation" beyond its plain meaning, the result would be the same. This follows from an examination of the evident purpose of the provision as well as a comparison of the language applicable to insurance companies generally with the language used in relation to title insurance companies.

The tax on gross premiums and the "in lieu" provision first appeared in the Constitution in 1910 as part of an overall revision of the state tax system with respect to corporations involved in certain kinds of businesses. The constitutional amendment "worked a radical change" in the system of taxation. Its purpose "was to divide the subjects of state and local taxation by imposing upon persons and corporations engaged in certain callings—those of public service corporations, insurance companies, banks and trust companies—the obligation to pay certain taxes to be applied exclusively to state

purposes. At the same time, the persons engaged and the property employed in these callings were, to a greater or less degree, to be free from the burden of local taxation. . . . [¶] Under the old system, the property and franchises of the corporations . . . were taxed for both state and local purposes. The amendment create[d] a new mode of taxing such property and franchises, and appropriate[d] the revenue so raised to state purposes solely. . . . The percentages enumerated in the amendment are declared to be 'in lieu of all other taxes,' etc., and such percentages were, doubtless, fixed at higher rates than would have been adopted in the absence of a restriction on other taxation." (*San Francisco* v. *Pacific Tel. & Tel. Co.,* *supra,* 166 Cal. at pp. 247-248; see also *Pacific Gas & Electric Co.* v. *Roberts,* *supra,* 168 Cal. at pp. 423-425.)

■ In short, the "in lieu" provision was intended to preclude the state or any of its subdivisions from exacting any other revenue from the specified corporations (except local taxes on real estate) and was granted in exchange for the payment of a tax on gross, rather than net, premiums, and at an adjustable rate higher than would otherwise be applied. By excepting real property taxes from the "in lieu" provision, however, the constitutional provision kept in place the traditional funding source for local governments, thereby accommodating the revenue needs of counties and municipalities.

The very existence of express exceptions—originally, real property, and later, motor vehicle taxes (§ 28, subd. (f)(1), (5))—serves to buttress the view that the "in lieu" provision means what it says. ■ "Under the familiar rule of construction, *expressio unius est exclusio alterius,* where exceptions to a general rule are specified by statute, other exceptions are not to be implied or presumed." (*Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 195 [132 Cal.Rptr. 377, 553 P.2d 537]; see *San Francisco* v. *Pacific Tel. & Tel. Co., supra,* 166 Cal. at p. 251.) As this court stated over 75 years ago, "the purpose of the constitution to exclude all other taxes and licenses is emphasized and accentuated by the one exception which that instrument itself declares . . . ." (*Pacific Gas & Electric Co.* v. *Roberts, supra,* 168 Cal. at p. 432 [construing the "in lieu" provision applicable to utilities].) ■ The electorate, in excepting from the "in lieu" provision taxes on real property and motor vehicles, could have made a further exception for taxes incidental to the operation of a commercial real estate business, but they did not.

A comparison of the section 28 tax and "in lieu" provisions applicable to insurance companies in general, with those applicable to companies transacting title insurance, is instructive. As originally adopted, former section 14 of article XIII of the California Constitution applied to all insurance companies, including title insurers. (See *Consolidated Title Sec. Co.* v. *Hop-*

*kins* (1934) 1 Cal.2d 414, 416 [35 P.2d 320]; *Title Ins. & Trust Co.* v. *Los Angeles* (1923) 61 Cal.App. 232 [214 P. 667].) In 1942, the electorate adopted former section 14 4/5 of article XIII of the Constitution, which distinguished between insurers not transacting title insurance in this state and those transacting title insurance. For the former, the basis of the annual tax remained the amount of gross premiums; for title insurance companies, the basis became "all income upon business done in the state," except as provided. The exceptions are interest and dividends, rents from real property, profits from the sale of investments, and income from investments. If the title insurance company has a trust department and does trust business, income from such trust business is also excepted. (Art. XIII, former § 14 4/5, subd. (c); see now § 28, subd. (c).) In that case, however, the trust business is taxable to the same extent as trust companies and the trust departments of banks. (Art. XIII, former § 14 4/5, subd. (f)(2); see now § 28, subd. (f)(2).)[4]

■ The new section recognized that title insurers are engaged in a different type of insurance than other insurers and should be taxed on a different basis. (*Title Ins. etc. Co.* v. *Franchise Tax Board* (1956) 145 Cal.App.2d 60, 64 [302 P.2d 79].) But while the electorate established income rather than gross premiums as the basis for the title insurers' tax, they expressly excepted income from investments—i.e., interest and dividends, rents and profits from real estate, and income from other investments. In so doing, the electorate assured that title insurers, despite their different basis, would nevertheless, like other insurers, be free of taxation on investment income. (See *First American Title Ins. & Trust Co.* v. *Franchise Tax Bd., supra*, 15 Cal.App.3d 343, 346-347.)

The new section also recognized that the trust business of title insurers is different from insurance business. "It was clearly the purpose of the new section that the trust portion of the business done by [title insurance] companies . . . was not to be considered as insurance business and therefore should not be taxed as insurance business." (*Title Ins. etc. Co.* v. *Franchise Tax Board, supra*, 145 Cal.App.2d at p. 63.) Rather, the provision was so phrased "that the trust business of title companies shall be required to pay the same type tax as trust companies and banks doing a trust business are required to pay." (*Id*. at p. 64.)

In the title insurance provision, therefore, the electorate demonstrated both their intention to exempt insurers' investment income from taxation

---

[4] Section 28, subdivision (f)(2) provides in pertinent part that a title insurer "which has a trust department or does a trust business under the banking laws of this state is subject to taxation with respect to such trust department or trust business to the same extent and in the same manner as trust companies and the trust departments of banks doing business in this state."

and their ability, when they wish, to tax insurers' noninsurance business. Where the electorate has demonstrated the ability to make their intent clear, it is not the province of this court to imply an intent left unexpressed. ■ "It is a prime rule of construction that the legislative intent underlying a statute must be ascertained from its language; if the language is clear, there can be no room for interpretation, and effect must be given to its plain meaning. [Citations.] 'An intent that finds no expression in the words of the statute cannot be found to exist. The courts may not speculate that the legislature meant something other than what it said. Nor may they rewrite a statute to make it express an intention not expressed therein.'" (*Hennigan* v. *United Pacific Ins. Co.* (1975) 53 Cal.App.3d 1, 7 [125 Cal.Rptr. 408].)

In *Massachusetts Mutual Life Ins. Co.* v. *City and County of San Francisco, supra,* 129 Cal.App.3d 876, relied on by the city, the Court of Appeal rejected the plain meaning of the "in lieu" provision in favor of an interpretation it believed was consonant with the policy underlying the constitutional provision. In that case, the insurer owned the Hyatt Hotel on Union Square in San Francisco and agreed with another corporation that the latter would operate the hotel for 20 percent of the profits. The Court of Appeal upheld the city's imposition of ad valorem taxes against the insurer on hotel personal property owned by it and leased to the hotel operator.

Stating that the quid pro quo for the "in lieu" tax exemption is the imposition upon insurers of a tax on gross premiums, rather than net profits, as in the common commercial case (129 Cal.App.3d at p. 881), the *Massachusetts Mutual* court reasoned: "Since the 'in lieu' exemption is granted in return for imposition of a tax on gross, rather than net, receipts, and is functionally related to the tax which insurers must pay on gross premiums paid to the company for insurance benefits [citation], in our view it would be inappropriate to allow a tax exemption for property owned by an insurer but not used to produce taxable gross premiums. If it were otherwise, an insurer could entirely escape taxation of all revenue-producing property not used to generate 'gross premiums.' Under such circumstances, . . . the quid pro quo for the 'in lieu' exemption no longer exists; the insurer retains the privilege of doing business, and derives profits, but pays the state nothing for property owned and used in deriving a conceivably substantial source of its income. We do not think the electors intended such a result." (*Id.* at p. 882.)

■ *Massachusetts Mutual* is faulty in several respects. First, the court completely overlooked this court's opinion in *Consolidated Title Sec. Co.* v. *Hopkins, supra,* 1 Cal.2d 414. There, in interpreting the in lieu provision, we stated: "The insurance company gross premiums tax frees from local taxa-

tion, except taxes on real estate, all 'property of such companies.' *Use of personal property in the conduct of the insurance company's business is not the factor which determines freedom from local taxation."* (*Id.* at p. 420, italics added.)

Second, the court based its holding on its unsupported view of the result dictated by the quid pro quo policy underlying the constitutional provision, rather than the particular constitutional language. ▇▇ The court thereby violated the fundamental principle of interpretation that "[w]hen statutory language is . . . clear and unambiguous there is no need for construction and *courts should not indulge in it."* (*Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148], italics added.)

▇▇ Third, the court's premise, that the operation of an active business that generates gross operating *revenues* is not used to produce gross *premiums* (129 Cal.App.3d at pp. 882, 886), is contrary to both the testimony in the present case and the undisputed fact that income from investments, of whatever kind, is necessary to maintain sufficient reserves to meet policyholders' claims. As the United States Supreme Court has observed: "An insurance company obtains most of its funds from premiums paid to it by policyholders in exchange for the company's promise to pay future death claims and other benefits. The company is also obligated to maintain reserves, which, if they are to be adequate to pay future claims, must grow at a sufficient rate each year. *The receipt of premiums necessarily entails the creation of reserves and additions to reserves from investment income.* Thus the insurance company is not only permitted to invest, but it *must* invest; and it *must* return to the reserve a large portion of its investment income. As no insurance company would deny, there is sufficient economic and legal substance to the company's obligation to return a large portion of investment income to policyholder reserves to warrant or require the exclusion of investment income so employed from the taxable income of the company." (*United States* v. *Atlas Ins. Co.* (1965) 381 U.S. 233, 247 [14 L.Ed.2d 358, 367, 85 S.Ct. 1379], first italics added, remaining italics in original.)

In its quid pro quo analysis, the court failed also to acknowledge the authority of the Legislature, by majority vote, to increase the rate of the gross premiums tax. (§ 28, subd. (i).)[5] So long as the Legislature has authority to adjust the tax rate on gross premiums, the quid pro quo for exempting insurers from all other taxes obtains. If the Legislature determines insurers are not bearing their fair share of the tax burden, it need only increase the rate of taxation on gross premiums.

---

[5] Subdivision (i) of section 28 was amended in 1976 to permit increase of the tax rate by a majority, rather than a two-thirds, vote of the Legislature, as had previously been the case. (Historical Note, 3 West's Ann. Cal. Const., *supra*, art. XIII, § 28 (1990 pocket supp.) p. 60.)

Finally, the court's conclusion, that revenues from a so-called "active" business are taxable, leads to inconsistent results. The exemption from taxation of income from "passive" investments, such as stocks and bonds, has been established for more than half a century. (See *Consolidated Title Sec. Co.* v. *Hopkins, supra,* 1 Cal.2d at p. 419.) If income and profits from investment in intangibles, such as stocks, bonds, mortgages and other securities, is exempt from taxation, what justification is there to except income and profits from investment in real estate? An investment of premiums, whatever its manner or means, is an investment; its purpose, irrespective of the form it takes, is in each instance the same: to accrue income to cover operating expenses and return to the company's reserve sufficient funds to pay future claims.[6]

Observing that until 1945 insurers were prohibited by law from investing in real property not used for a home office, the city seeks justification in the argument that the electorate could not have intended to except such income and profits from taxation. But the electorate expressly did just that in the provisions relating to title insurers; the city does not attempt to explain why the electorate should have had a different intent with respect to insurers not transacting title insurance and which, unlike title insurers, are not even taxed on income. The dissent likewise fails to address this issue, preferring instead to conjure up visions of the "gross injustices" our decision assertedly will create. Rhetoric aside, however, the fact is that in the constitutional provision applicable to title insurers the electorate has expressly adopted the very exemptions the dissent finds so unjust. (§ 28, subd. (c).) The dissent fails entirely to explain why the electorate should have thus favored title insurers, but not others.

---

[6] It is interesting to note that the dissent accepts that the "in lieu" provision confers on insurers the advantage of exemption from taxes on income from so-called "passive" investments, yet finds it "unthinkable" and "inconceivable" that the electorate intended to confer a comparable advantage for income from "active" investments. (*Post,* pp. 418, 425.) Cries of alarm aside, where does it find the distinction? Certainly not in the Constitution. Subdivision (f) of section 28 plainly exempts insurers from "all other taxes," not, as the dissent would have it, from all other taxes *except* those imposed on revenue from so-called active investments.

The dissent misses the point in footnote 4 of its opinion, where it tells us that federal income tax law draws a distinction between active and passive investments in the context of determining whether certain losses are deductible. Federal law specifically recognizes the distinction; our Constitution does not. Indeed, the dissent does not even claim a constitutional basis for the distinction. Rather, the dissent is frankly engaged in an attempt to legislate according to its view of desirable policy—of what it deems "fair." This is apparent from the very outset of the opinion where, admittedly "[w]*ithout considering the language or history of subdivision (f) [of section 28] or the cases interpreting [it*]," the dissent declares it "obvious from the consequences which will follow the majority's holding that the construction [the majority] advances is unsound." (Dis. opn. of Mosk, J., *post,* at p. 417 (italics added).) With this result-oriented beginning, the opinion's conclusion comes as no surprise. Our task, however, is to construe the Constitution, not to rewrite it.

The issue, moreover, is not what the insurers' investment practices may have been when section 28 was originally adopted, but whether, under the constitutional provision, income and profits from investments, then or now, is subject to local taxation. As indicated, the answer plainly is in the negative. As this court stated in the analogous context of construing the public-land tax exemption (Cal. Const., art. XIII, former § 1; see now art. XIII, § 3, subds. (a) and (b)), " 'The fact that social, economic, and political conditions in this state have undergone great changes since the adoption of our present Constitution . . . would not justify a construction of this provision which would in effect result in its amendment by the courts and not by the people.' " (*Anderson-Cottonwood I. Dist.* v. *Klukkert* (1939) 13 Cal.2d 191, 197 [88 P.2d 685].) Section 28, moreover, has been amended numerous times since 1945, most recently in 1976 (see Historical Note, 3 West's Ann. Cal. Const., *supra*, art. XIII, § 28 (1990 pocket supp.) p. 60); the "in lieu" tax provision was reenacted on each occasion (see *Smith* v. *Board of Trustees* (1926) 198 Cal. 301, 306 [245 P. 173]), presumably with the voters' full knowledge of the investment practices of insurance companies.

As further justification, the city raises the specter of insurers exploiting the exemption by conducting extensive commercial enterprises under the umbrella of the constitutional tax exemption, to the disadvantage of citizens not favored by such an exemption. The dissent likewise invokes a "parade of horrors" that assertedly will follow from our decision. Neither, however, recognizes that the constitutional exemption applies only to *insurers*—that is, organizations whose primary purpose and function is to assume the risk of loss under contracts of insurance or reinsurance. (See Ins. Code, § 826; cf. 26 C.F.R. § 1.801-3 (1989).) Insurance companies, moreover, are highly regulated and strictly limited by law as to their permissible investments. (Ins. Code, §§ 1100-1107, 1150-1250.) Except in the context of investments in stock or other securities, the provisions of the Insurance Code that authorize and regulate insurance company investments simply do not mention nonreal-estate commercial enterprises. Moreover, the state Legislature, in the exercise of its authority to regulate insurers' investments, could, if it wished, eliminate any perceived abuse of insurers' tax status simply by amending the laws governing their permissible investments.[7]

Nor, in any event, would the claimed consequence alter our conclusion. ▇ "[C]ourts, in construing the constitution, are bound to sup-

[7] Because insurance companies' permissible investments are limited and subject to comprehensive regulation, unlike the dissent we place little weight on counsel's "concession" at oral argument that, if the "in lieu" provision means what it says, as we hold it does, an insurance company may own and operate a doughnut shop, a bowling alley, a department store, or any other venture, and the profits from the enterprise will be virtually free of all taxes. Neither the record nor authority supports such a conclusion.

pose that any inconveniences involved in the application of its provisions, according to their plain terms and import, were considered in its formation, and voluntarily accepted as less intolerable than those which are thereby avoided, or as fully compensated by countervailing advantages." (*People* v. *Pendegast* (1892) 96 Cal. 289, 294 [31 P. 103]; *Sturges* v. *Crowninshield* (1819) 17 U.S. (4 Wheat.) 122, 202-203 [4 L.Ed. 529, 550].)

In sum, the court's holding in *Massachusetts Mutual Life Ins. Co.* v. *City and County of San Francisco, supra,* 129 Cal.App.3d 876, is unsupported and unpersuasive, and we disapprove it.

Finally, the city cites in support a Delaware case, *Continental Amer. Life Ins. Co.* v. *City of Wilmington* (Del.Super.Ct. 1970) 273 A.2d 277.[8] There, the state statute provided that the state's fee, charges and premium taxes should be "in lieu of all county and municipal license fees and taxes *upon the business of insurance* in this State, excepting property taxes." (273 A.2d at p. 278, italics added.) California's gross premiums tax, by contrast, is in lieu not merely of taxes on the business of insurance, but of taxes "upon such insurers and their property." (§ 28, subd. (f).) The Delaware case, therefore, has no bearing on the application of our constitutional provision.

In the face of the foregoing, for this court to read an "active" investment exception into section 28 would be nothing more than judicial legislation. The Constitution not having provided such an exception, it is not within our province to do so. "The constitution is to be interpreted by the language in which it is written, and courts are no more at liberty to add provisions to what is therein declared in definite language than they are to disregard any of its express provisions." (*People* v. *Campbell* (1902) 138 Cal. 11, 15 [70 P. 918]; see *Ross* v. *City of Long Beach* (1944) 24 Cal.2d 258, 260 [148 P.2d 649].) The wisdom of the constitutional provision is not for us to judge, and any inequity resulting is for the people or the Legislature to correct.

Considerations of policy, in any event, arguably support the exemption of investment income from taxation. Because insurance companies do not generate sufficient income from premiums to pay their operating expenses and claims, they must invest their premiums in order to stay in business and make a profit. The drafters of section 28 undoubtedly were mindful that insurance companies are unique in their exposure to payouts

---

[8] Two New Mexico cases also cited by petitioner, *First Nat. Bank of Santa Fe* v. *Commissioner of Rev.* (1969) 80 N.M. 699 [460 P.2d 64] and *Santa Fe Downs, Inc.* v. *Bureau of Revenue* (1973) 85 N.M. 115 [509 P.2d 882], are inapposite in light of the different state and federal statutes there at issue, and need not be discussed.

far in excess of premiums received and, unlike other businesses, need substantial reserves to meet potential claims in addition to operating expenses. Public policy is served when insurance companies remain solvent, and only by investment of premiums can an insurer maintain the necessary reserves. To tax investment income would be to minimize the value of the investment and reduce the sums available for the reserves, to the potential detriment of policyholders. The Legislature, moreover, has, as previously noted, imposed extensive statutory restrictions on insurers' permissible investments (e.g., Ins. Code, §§ 1100-1107, 1150-1250) and has specifically limited to 10 percent the amount of capital insurers may invest in real estate enterprises (Ins. Code, § 1194.8), the investment here at issue; if these limitations are insufficient, it is for the Legislature to address the problem, not this court.

In adopting section 28, the electorate clearly intended to exempt from taxation the income generated by insurers' so-called "passive" investments. (See *Consolidated Title Sec. Co.* v. *Hopkins, supra,* 1 Cal.2d at p. 419.) To exclude investments in real estate on grounds that they are "active" rather than "passive" investments, would arbitrarily and unjustifiably limit insurers' business judgment as how best to maximize their return on the investment of premiums. Absent an express directive requiring such a distinction, we decline to make it.

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Eagleson, J., and Kaufman, J.,* concurred.

**MOSK, J.**—I dissent.

The majority's construction of the "in lieu" provision creates a loophole in the tax laws in favor of insurance companies so sweeping, so obvious, and so burdensome on other taxpayers that it manifestly violates the intent of the voters in adopting section 28 of article XIII of our Constitution (section 28).

Without considering the language or history of subdivision (f) of that provision or the cases interpreting its language, it is obvious from the consequences which will follow the majority's holding that the construction it advances is unsound. If, as the majority hold, an insurer is exempt from taxation (except for real property and motor vehicle taxes) on any noninsurance business it may conduct solely because the business is owned by an insurance company, it may operate a chain of restaurants, a department

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Acting Chairperson of the Judicial Council.

store, theaters, clothing stores, video parlors, or any other enterprise, and the profits of these businesses will be virtually free of taxation because the insurer pays 2.35 percent of the gross premiums produced by its insurance business to the state. (Rev. & Tax. Code, § 12202.) Even if the premiums realized would be relatively low and the profits from noninsurance businesses in the millions, nevertheless the exemption granted by the majority's interpretation of subdivision (f) of section 28 would render those profits exempt from taxes with the minor exceptions stated above. Thus, the ordinary citizen who owns a neighborhood grocery store will be subject to taxes on his profits, as well as other business taxes, whereas his competitor down the street, a profitable chain grocery store owned and operated by an insurance company with huge assets, will be virtually exempt from all business taxes.

In order to take advantage of this enormously lucrative loophole, existing insurance companies would be well advised to invest in profitable businesses of all types; in order to render its profits free of taxation, a corporation could purchase an insurance company, even one that operates at a loss; and it is not inconceivable that insurance companies would be organized for the purpose of realizing tax-free profits from noninsurance related enterprises, with the insurance business being only a minor factor in their operations.

The majority's only answer to these obviously inequitable consequences which follow from its interpretation of the constitutional provision is that this potential scenario is unsupported by the record or authority. But these possibilities cannot be dismissed as merely the exaggerated fancies of a suspicious mind. Counsel for Mutual Life Insurance Company of New York (MONY) freely conceded at oral argument that if the majority's construction of the "in lieu" provision prevails an insurance company may own and operate a doughnut shop, a bowling alley, a beauty parlor, a restaurant, an auto shop or any other venture, and the profits and operations of these enterprises would be free of all taxes except for real property and motor vehicle taxes. Indeed, he conceded that if Allstate Insurance Company owned and operated the numerous Sears department stores Sears's profits would be exempt from taxation with these minor exceptions.

Although the majority refer to these prospects as a "parade of horribles," they do not deny that insurers may in fact take advantage of the "in lieu" provision in this manner, as MONY conceded. It is almost certain that following the filing of the majority opinion insurers, anxious like everyone else to reap tax-free income, will increase their investments in such enterprises.

It is unthinkable that the voters intended to grant insurers such an enormous competitive advantage in the operation of a noninsurance related

business over other businesses, or for that matter over the nonbusiness taxpayer who must pay taxes on his wages.

The majority's policy arguments to support their broad construction of the exemption are untenable. They point to the fact that the tax imposed by section 28 is on gross premiums, and state that the "in lieu" provision was granted in exchange for the payment of a tax on gross rather than net premiums. But business taxes on gross receipts are not unusual, and in no other context do they exempt the taxpayer from other types of taxes. To hold that not only is the insurer granted exemption from taxes for its insurance business and its passive investment income under the "in lieu" provision but that it is also exempt from taxation as to other noninsurance businesses in which it may engage, merely because its gross premiums are taxed, is manifestly discriminatory.

In fact, the taxes on the rental business and the business of operating a parking lot involved in this case are on gross receipts. It is difficult to justify a holding which allows an insurance company simply because of its status as an insurer to escape taxes on such enterprises on the ground that it pays taxes on its gross receipts in the insurance business, whereas the owner of a commercial building or a parking lot not in the insurance business who pays taxes on his gross receipts enjoys no such privilege.

Another policy argument made by the majority is that insurers must invest their income from premiums to generate sufficient funds to pay the claims of policyholders and that public policy is served when insurers remain solvent. Contrary to the majority's criticism, I freely concede the correctness of these propositions. But they are a non sequitur, irrelevant to the conclusion reached by the majority. Since the founding of this state, insurers have been able to sustain their operations with income derived from premiums and passive investments like stocks and bonds; the taxation of revenues from such investments is not challenged in this proceeding. There is no evidence that unless insurance companies can also operate carwashes, boutiques and department store chains virtually free of taxation they will be unable to pay the claims of their policyholders. And the majority do not mention that excess income of an insurer realized from the advantage gained by such investments may not be necessarily used to pay off policyholders but may increase the dividends received by investors.

The majority also seek to justify their holding by pointing out that the Legislature has limited the amount insurers may invest in unrelated businesses. (Ins. Code, §§ 1100-1107, 1150-1250.) For example, they point out that insurers are permitted to invest no more than 10 percent of their admitted assets in real estate. (Ins. Code, § 1194.8.) Presumably, the

inference the majority draw from these limitations is that insurers cannot take advantage of the "in lieu" provision to reap large profits from noninsurance business. But because insurance companies have such enormous assets, the limitations still allow insurers to obtain large profits from noninsurance business practically tax free, since even 10 percent of their admitted assets amounts to many millions of dollars.

The majority opine that we must turn a blind eye to the gross injustices created by their holding because the Constitution must be interpreted according to its "plain terms" in spite of "any inconveniences" that may be result, that the wisdom of a constitutional provision is not for the court to judge, and any inequity resulting from our interpretation is for the people or the Legislature to correct. I disagree. There is no principle of statutory or constitutional construction that takes precedence over the rule that an interpretation which leads to unreasonable and inequitable results will not be adopted if there is a reasonable alternative. (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 232 [110 Cal.Rptr. 144, 514 P.2d 1224]; *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 260 [104 Cal.Rptr. 761, 502 P.2d 1049]; *People* ex rel. *S.F. Bay etc. Com.* v. *Town of Emeryville* (1968) 69 Cal.2d 533, 543-544 [72 Cal.Rptr. 790, 446 P.2d 790].) Sutherland calls this the "golden rule of statutory interpretation." (2A Sutherland, Statutory Construction (4th ed. 1984) § 45.12, p. 54.)

As I shall demonstrate, there is such an alternative: the "plain meaning" rule does not call for the result reached by the majority because the "in lieu" provision is ambiguous; even if that was not the case, we would not be prohibited from considering whether the voters intended subdivision (f) to mean that insurance companies would be virtually free from taxation on any extraneous business conducted by them simply because of their status as insurers; and finally, the legislative history of section 28 shows that the voters made clear in successive elections precisely that they did not wish to grant such unprecedented privileges to insurance companies.

Section 28 is in fact ambiguous. Subdivision (b) provides that an annual tax is imposed *"on each insurer doing business"* in California, and subdivision (c) states that the basis of the tax is the "gross premiums received . . . by such insurer *upon its business done in this state.*" (Italics added.) Under subdivision (f), the tax imposed by the section is "in lieu of all other taxes . . . upon such insurers and their property." As amicus curiae point out,[1] it is not clear from this language whether the term "insurer doing business" in California in subdivision (b) refers to any type of business operated by an

---

[1] The City and County of San Francisco, and the Cities of San Diego, Roseville, Santa Clara, Tustin and Santa Barbara have filed an amicus curiae brief on behalf of the City of Los Angeles.

insurer in this state, or only to the insurer's participation in what is ordinarily viewed as the insurance business, i.e., issuing policies and paying claims and activities ancillary to these functions. The language could be viewed to favor the position of amicus curiae, since the reference in subdivision (c) to *gross premiums* on an insurer's "business done in this state" can mean only insurance business, and it may be argued that the phrases underlined above in subdivision (b) and (c) should be interpreted in a similar fashion. On the other hand, subdivision (b) must be read in conjunction with subdivision (f), which broadly exempts insurers and their property from "all other taxes." In view of this ambiguity as to the meaning of the section, a consideration of its origins and purpose would clearly be justified.[2]

But even if section 28 did not contain an ambiguity, we would not be prohibited from attempting to determine whether the voters intended it to be read, as MONY contends, to exempt insurers, solely because of their status as such, from all taxes except those specified on the revenues and property of any business they may own and operate.

It is often said that the words of a statute should be given the meaning they bear in ordinary use (e.g., *In re Rojas* (1979) 23 Cal.3d 152, 155 [151 Cal.Rptr. 649, 588 P.2d 789]), and that there is no need for construction if the language used in the provision is unambiguous (*In re Lance W.* (1985) 37 Cal.3d 873, 886 [210 Cal.Rptr. 631, 694 P.2d 744]). But these rules do not prevent a court from determining whether the literal meaning of a statute is consistent with its purpose. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323]; *County of San Diego* v. *Muniz* (1978) 22 Cal.3d 29, 36 [148 Cal.Rptr. 584, 583 P.2d 109]; *Younger* v. *Superior Court* (1978) 21 Cal.3d 102, 113 [145 Cal.Rptr. 674, 577 P.2d 1014]; *People* v. *Davis* (1978) 85

[2] I am unimpressed with the majority's reliance on *Pacific Gas & Electric Co.* v. *Roberts* (1914) 168 Cal. 415 [143 P. 597], for the proposition that the "in lieu" provision is not ambiguous. The issue there was whether the motor vehicle tax was included in the "in lieu" exemption as a privilege or excise tax. In the first place, the constitutional provision applicable in that case provided an exemption only for property "used exclusively" in the operation of the business of the utility. Second, the case was decided at a time when insurers such as MONY were confined to passive investments and decades before they were permitted to invest in real estate (see Stats. 1945, ch. 1073, § 3, p. 2072) or to operate any other business aside from the insurance business. The statement in the decision that the "in lieu" provision was clear must be read in the light of these crucial differences.

Of the remaining cases relied on by the majority for the proposition that no court "faced with the issue ever found" the "in lieu" provision ambiguous, only one case cited discussed the question of ambiguity (*First American Title Ins. & Trust Co.* v. *Franchise Tax Bd.* (1971) 15 Cal.App.3d 343 [93 Cal.Rptr. 177]), and it refused to consider the legislative history and purpose of the predecessor provision to section 28 on the ground that its meaning was clear and no extrinsic aids to construction were required. For the reasons stated below, this refusal to look beyond the statutory language, even to decide whether a literal interpretation of a statute is consistent with its purpose, is incorrect.

Cal.App.3d 916, 924 [149 Cal.Rptr. 777].) The intent of a statute prevails over the letter, and the letter will, if possible, be read so as to conform to the spirit of the enactment. (*People* v. *Belton* (1979) 23 Cal.3d 516, 526 [153 Cal.Rptr. 195, 591 P.2d 485]; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281].) In order to make sense out of an initiative voted on by the people, we held in *People* v. *Skinner* (1985) 39 Cal.3d 765 [217 Cal.Rptr. 685, 704 P.2d 752] that "and" really meant "or." We declared that where the purpose or intent of a statute seems clear, drafting errors or uncertainties "may properly be rectified by judicial construction." (*Id.* at p. 775; see also *People* v. *Horn* (1984) 158 Cal.App.3d 1014 [205 Cal.Rptr. 119].)

As an eminent authority on statutory interpretation has observed, "Although many expressions favoring literal interpretation may be found in the cases, it is clear that if the literal import of the text of an act is inconsistent with the legislative meaning or intent, or such interpretation leads to absurd results, the words of the statute will be modified to agree with the intention of the legislature . . . . 'While the intention of the legislature must be ascertained from the words used to express it, the manifest reason and obvious purpose of the law should not be sacrificed to a literal interpretation of such words.' " (2A Sutherland, Statutory Construction, *supra*, § 46.07, p. 110.) These rules apply to the interpretation of constitutional provisions as well as to statutes. (*Stanton* v. *Panish* (1980) 28 Cal.3d 107, 115 [167 Cal.Rptr. 584, 615 P.2d 1372].)

The literal interpretation of section 28 would lead to a result obviously not intended by the voters who adopted that provision. Its language is sweeping: it provides that the gross receipts tax is "in lieu of *all* other taxes and licenses, state, county, and municipal, upon insurers and their property" except taxes on real estate and motor vehicles. (Italics added.) Construed literally, the provision would lead to the unreasonable and unjust results referred to above. Unless it is clear that the voters intended that insurers were to be exempted from taxes on any type of business in which they chose to engage, we should not slavishly adhere to the literal language of the section. The voters have made clear in several elections their intention not to grant such unprecedented benefits to insurance companies.

The tax on gross premiums and the "in lieu" provision first appeared in the Constitution in 1910 as subdivision (b), former section 14 of article XIII. It was part of a "radical change in the system of taxation" in that it divided "the subjects of state and location taxation by imposing on . . . corporations engaged in certain callings [including] insurance companies . . . the obligation to pay certain taxes to be applied exclusively to state purposes. At the same time, the persons engaged and the property

employed in these callings were, to a greater or less degree, to be free from the burden of local taxation." (*San Francisco* v. *Pacific Tel. & Tel. Co.* (1913) 166 Cal. 244, 247 [135 P. 971].) Over the years, the constitutional provision has been amended a number of times. The history of these amendments makes it abundantly clear that section 28 was not to be construed to afford insurance companies a competitive advantage in the operation of a commercial real estate business or any other business over others engaged in similar enterprises. While the matters discussed below refer to the gradual elimination by the voters of an exemption for real property taxes which insurers were granted in the original "in lieu" provision of 1910, the reasons for the elimination of that exemption are instructive in determining the intent of the voters regarding the taxes involved in this case as well.

As noted above, the tax on gross premiums and the "in lieu" exemption first appeared in the Constitution in 1910 as former section 14, subdivision (b) of article XIII. It provided that insurers would be taxed 1½ percent of their gross premiums, and that this tax was in lieu of any other state, county, or municipal taxes, except for local taxes on real estate. However, to the extent real estate taxes were paid, they were deducted from the gross premiums tax payable to the state. In effect, therefore, insurance companies were exempt from the payment of real estate taxes.

In 1942, this provision was amended (by the addition of former section 14 4/5 to article XIII) to deprive insurance companies of the deduction of real estate taxes from the state tax (over a five-year period), except for the taxes paid on their principal or home offices, which would continue to be deductible from the gross premiums tax. The reason for the change, as explained in the argument in favor of the measure in the voter's pamphlet, was that the deduction of real estate taxes from the gross premiums tax had an unexpected and unintended effect. In 1942, insurance companies were permitted to own real property for use as their home offices, or, for a period of five years, property acquired by foreclosure of loans. Insurers that had made loans on property during the depression and had foreclosed on those loans, acquired more real estate than they would have under normal circumstances. As a result, they paid higher real estate taxes to local governments and deducted these payments from their gross premiums tax, depriving the state of much needed revenue. These companies thus "inadvertently" received preferential treatment over insurers which had not invested in mortgages as well as "over citizens who own and operate similar properties in that the insurer's expense of operation of such properties is lessened by the credit against State taxes in the amount of local real estate taxes thereon. [¶] This amendment was drawn to correct these inequalities . . . ." (Ballot Pamp., argument in favor of Prop. 7, Gen. Elec. (Nov. 3, 1942) pp. 12-13.)

Thus, after 1942, except during a five-year phase-out period, insurance companies were in effect exempt from real estate taxes only to the extent that they owned property used for their principal or home office. The voters then turned their attention to this exemption. In a report issued by the Assembly Interim Committee on Revenue and Taxation in 1964, which contained a thorough review of the history and effects of the principal office deduction, it was recommended that the deduction be eliminated altogether. (See 4 Rep. of the Assem. Interim Com. on Revenue and Taxation No. 15, The Insurance Tax, A Major Tax Study, pt. 8 (Dec. 1964) 1 Appen. to Assem. J. (1965 Reg. Sess.) [hereafter cited as Assem. Com. Rep.].) The report observed that some insurance companies, spurred on by the advantage of owning real estate without being obligated to pay property taxes, had built large buildings, occupying only a small part and leasing the rest to other tenants (id. at pp. 44-45, 53). It concluded that the exemption should be repealed because it gave insurance companies which owned office buildings a competitive advantage over other owners of such buildings as well as over insurers which did not own these facilities, in the form of a tax-sheltered rental income, amounting to an unfair subsidy. (Id. at pp. 39, 44, 53.)

However, the Legislature proposed a modified version of this recommendation to the electorate as Proposition 8 at the election in 1966. The measure limited but did not eliminate the home office deduction, basing the deduction on the amount of space occupied in the building by the insurance company and its affiliates, and making the measure prospective as to California insurers. The argument in favor of the measure stated that it would remove the advantage enjoyed by out of state insurance companies which owned large office buildings rented to others, over other suppliers of office space. (Ballot Pamp., argument in favor of Prop. 8, Gen. Elec. (Nov. 8, 1966) pp. 13-14.) The argument against the measure advocated the repeal of the entire home office deduction on the ground that it is "inequitable as between various insurance companies as well as with regard to other industry." (Id., argument against Prop. 8, p. 14.) The proposal was adopted by the voters as an amendment to former section 14 4/5 of article XIII.

The principal office deduction was eliminated entirely in 1976, when the voters amended the section (renumbered section 28 of article XIII), to except real estate taxes from the scope of the "in lieu" provision altogether, so that all insurers are now liable for the payment of real property taxes even if the property is the home office of the company, without any deduction of such payments from the gross premiums tax. The 1976 ballot argument of the proponents of the measure noted that the deduction was a "65-year old tax loophole which allows a few big insurance companies to escape paying their fair share of state taxes," and that the tax was "unfair to the

average taxpayer, . . . [and] gives an unwarranted competitive advantage to these specially privileged companies." (Ballot Pamp., argument in favor of Prop. 6, rebuttal to argument against Prop. 6, Primary Elec. (June 8, 1976) pp. 28, 29.)

This history demonstrates unmistakably that the voters wanted to deny to insurance companies an exemption from taxes on real property which they operated as a commercial rental business. An important reason for eliminating the exemption was that it gave an insurer operating such a business a competitive advantage over similar businesses conducted by noninsurers as well as over insurance companies that did not own real estate. It is inconceivable, then, that the electorate intended by the "in lieu" provision to exempt insurers from taxes, such as those in issue here, which are incident to the operation of a commercial real estate business. Whether the tax is on the real property as such, or on the business of operating it as a commercial venture in competition with other like enterprises, the advantage enjoyed by the insurance company is the same: it is exempt from taxes that other owners of commercial property must pay. This reasoning applies with equal force to other kinds of businesses operated by an insurance company.[3]

The majority's criticism of the holding in *Massachusetts Mutual Life Ins. Co.* v. *City and County of San Francisco* (1982) 129 Cal.App.3d 876 [181 Cal.Rptr. 370] is unwarranted. They state, for example, that the decision was wrong in holding that profits derived by an insurer from the operation of a noninsurance business are not used to produce gross premiums because, according to the majority, income from investments is necessary to maintain sufficient reserves to meet policyholders' claims. As I observe above, there is no evidence that income derived by an insurer from the active operation of a business, as opposed to passive investments, is "necessary" to maintain reserves to pay claims. Even if there were some indirect connection between the profits of an unrelated business and the production of premiums, nothing prevents profits from such a business to be used not to make payments to policyholders but to increase the dividends paid to the stockholders of the insurer.

---

[3] The majority miss the point in claiming that we are compelled to adopt their interpretation of the "in lieu" provision because the Constitution itself does not make a distinction between an insurer's investment in stocks and bonds and operating a chain of video parlors. At the time the constitutional provision was adopted in 1910, insurance companies like MONY were not permitted to own real estate for investment or to engage in any other noninsurance business. Our task is to decide whether the voters intended by the "in lieu" provision to open the floodgates so as to render any business in which an insurance company chooses to engage virtually free of taxation. In making this determination, the majority give no consideration whatever to the consequences of their holding, in violation of the rules of construction noted above.

Although the majority criticize *Massachusetts Mutual* for failing to recognize that the Legislature can raise the tax on gross premiums from 2.35 percent if it chose to do so, such an action would have little effect on the situation sanctioned by the majority's holding, i.e., the minor insurance business tail wagging the hugely profitable noninsurance business dog.

Finally, I draw a different inference than that drawn by the majority from the fact that the voters decided in 1942 that trust business of title insurers, which is classified as noninsurance business, was subject to taxation to the same extent as other trust businesses. Prior to the 1942 amendment to former section 14 4/5 of article XIII of our Constitution, the trust business engaged in by title insurers was exempt from taxation to the same extent as its other operations. In 1942, however, the electorate made it clear that a title insurer was not to be permitted to operate under the insurance exemption for revenues produced by its noninsurance trust business, even though the trust business was the only noninsurance enterprise that title insurers had traditionally conducted. Although the majority draw from this the inference that the electorate knows how to exclude insurers from the "in lieu" exemption when it wishes, in my view it demonstrates, rather, that when the electorate was given a choice whether or not to withdraw the insurance exemption from noninsurance business conducted by an insurance company, it chose to do so. So far as I am aware, there was no suggestion prior to the *Massachusetts Mutual* case that insurance companies (with the exception of title insurers) were actively operating businesses unrelated to their insurance business, except for the "home office" exemption discussed above. When the electorate was asked whether insurers should enjoy tax exemptions on their noninsurance business, they unmistakably responded in the negative, even as to the trust business that title insurers had traditionally conducted. It is unreasonable to hold that the voters intended the far broader exemption granted by the majority, which will allow insurance companies to realize tax sheltered income, amounting to a subsidy (Assem. Com. Rep., *supra,* at pp. 39, 44, 53) in the operation of any extraneous business in which the insurer chooses to engage.[4]

In the final analysis, the majority decision grants insurance companies that operate extraneous businesses a virtual exemption from taxes, a benefit

---

[4] Although the majority are critical of the fact that I offer no guidance for drawing a line between passive and active investments, a similar distinction exists in the federal income tax laws for the purpose of determining whether certain losses or credits may be used as deductions. (See 26 U.S.C. §§ 162, 469; Bittker & Lokken, Federal Taxation of Income, Estates and Gifts (2d ed. 1989) §§ 20.1.1 et seq., 28.1 et seq.) Certainly there can be no problem in distinguishing between the traditional investments made by insurance companies in stocks, bonds and mortgages and the operation of a parking facility.

that has heretofore belonged only to churches and charities. I know of no insurance carrier that qualifies as a church or charity.[5]

It now appears that the people must amend section 28 of the Constitution or the Legislature must confine insurance company investments to the traditional source of nonpremium income, i.e., passive investments like stocks and bonds, to correct the unconscionable advantage granted to insurers by the majority's unprecedented holding.

Broussard, J., and Kennard, J., concurred.

---

[5] But see *Jimmy Swaggart Ministries* v. *Bd. of Equalization* (1990) 493 U.S. __ [107 L.Ed.2d 796, 110 S.Ct. 688], in which even a church activity was subject to taxation.