[No. A109488. First Dist., Div. One. Mar. 15, 2006.]

RICHARD AARON et al., Plaintiffs and Respondents, v. DALLAS DUNHAM et al., Defendants and Appellants.

COUNSEL

Law Office of W. G. Watson, Jr., Philip G. Watson and Stephen G. Watson for Defendants and Appellants.

Janssen, Malloy, Needham, Morrison, Reinholtsen & Crowley, W. Timothy Needham and Caroline O. Musolff for Plaintiffs and Respondents.

OPINION

MARGULIES, J.—

## I. INTRODUCTION

In 2000, plaintiffs Richard and Lilia Aaron (Aarons) purchased real property adjoining the property owned by defendants Dallas and Patricia Dunham (Dunhams). Although the Aarons' new property was served by a steep driveway, use of that driveway had long since been discontinued by previous owners because more convenient access to the property existed via a private road across the Dunham property. This road had been built by an oil company to provide access to gas wells on neighboring property. For nearly 20 years, occupants of the Aaron property had made unimpeded use of this road. Not long before the Aarons' purchase, however, the Dunhams had begun to limit use of the road.

The Aarons filed this lawsuit to establish their right to a prescriptive easement across the Dunham property, based on their predecessors' use of the road. The evidence demonstrated that express permission to use the road had been granted to the owners of the Aaron property in 1982, when the road was built, but that two other sets of occupants had used the road since then without asking or receiving permission. On the basis of this evidence, the jury found that adverse, open, and uninterrupted use of the road had been made at least from 1990 to 1995. Although the lessee oil company had posted signs on the road pursuant to Civil Code[1] section 1008, which would ordinarily prevent the acquisition of a prescriptive easement, the trial court ruled that the signs were not effective because they were not erected by the owner of the property, as required by the statute, and granted the Aarons a prescriptive easement. We affirm.

## II. BACKGROUND

The Aarons purchased the property at 1643 Tompkins Hill Road (Tompkins Hill property) in Fortuna in June 2000. The only access to public roads over

---

[1] All statutory references are to the Civil Code, unless otherwise indicated.

their property is a one-half-mile-long steep driveway. The driveway presents difficult passage, particularly in inclement weather. Further, because of its precarious location, maintaining the driveway is "a labor of Sisyphus." For these reasons, regular use of the driveway had been discontinued some 20 years before the Aarons' purchase because more convenient access was available over a paved private road, known as the Texaco Road, that crossed the adjoining property at 40 Graham Way (Graham Way property).

The Graham Way property is owned by the Dunhams. Mrs. Dunham first acquired an ownership interest in the property through inheritance in 1990. Prior to that, the property had been owned by her stepmother, Thelma Ettline, and Mrs. Ettline's brother, William Graham, who lived there from his birth in 1898 until his death in 1985. After Graham's death, his widow continued living on the property into the early 1990's. The Dunhams did not take up residence on the Graham Way property until 1999.

The Texaco Road was cut and paved in 1982 by Texaco Inc. (Texaco) in order to service natural gas wells. Texaco operated the wells pursuant to an oil and gas lease it executed in 1934 with a few landowners in the area, including a predecessor in interest of the Dunhams. The 1934 lease provided Texaco the right to prospect for and produce oil and natural gas on the subject properties, including the Graham Way property, and to construct the wells, pipelines, roads, and other structures necessary to support such production. The Texaco Road begins at Graham Way, a public road, meanders over the Graham Way property, cuts briefly across a corner of the Tompkins Hill property, and comes to a dead end at the gas wells, which are located on a third property.[2] While the road provides a convenient way for residents of the Tompkins Hill property to reach their home, they must pass over the Graham Way property to get there. On the other hand, because the Texaco Road does not pass near the homestead on the Graham Way property and is maintained by Texaco, this use imposes little burden on residents of the Graham Way property.

Just prior to construction of the Texaco Road, the Tompkins Hill property had been purchased by Ezbon and Susan Jen (Jens). Discussing the proposed road with officials from Texaco, Mr. Jen recognized that it would provide ready access to his new home. Because an official told Jen that Texaco did not own the land underlying the portion of the road on the Graham Way property, Jen asked the Grahams for permission to use it. Mr. Graham, then in his 80's and retired, and his wife, then in her 70's, readily gave the Jens permission to use the road for "as long as [Jen] wanted or something to that

---

[2] With respect to the Graham Way property, Texaco appears to have built and used the road under the rights granted in the 1934 lease, rather than under a grant of easement. In any event, the record does not contain any easement to Texaco over the Graham Way property.

effect." Having gotten the Grahams' oral permission to use the road, Jen felt it unnecessary—as he testified, "insulting" and not "the decent thing to do"—to ask for written confirmation or a formal easement. Jen thereafter used the Texaco Road exclusively, allowing his long driveway to fall into disrepair.

After about three years, in November 1985, the Jens moved out and rented the Tompkins Hill property to the Bush family, who occupied the home and used the Texaco Road for at least two years. No member of the Bush family testified regarding the circumstances under which they had used the road. In particular, there is no evidence that the Bushes ever spoke with Mrs. Graham or Mrs. Ettline, the co-owner, about their use of the road.

After the Bushes moved out, the Jens sold the property to Gail and Stanley Fullerton (Fullertons) in 1989. Like the Jens, the Fullertons preferred to use the Texaco Road to access their home. Over time, however, Mr. Fullerton reopened the old driveway, and they used it on occasion. The Fullertons testified that they never requested permission to use the Texaco Road from anyone.

Sometime between 1990 and 1993, Texaco posted on the Graham Way property at least one, and possibly more, "permission to pass" signs under the authority of section 1008. Section 1008 states, in general terms, that an owner of property can protect against the acquisition of a prescriptive easement by posting signs "reading substantially as follows: 'Right to pass by permission, and subject to control, of owner: Section 1008, Civil Code.' " The Texaco sign or signs contained exactly this text, along with the legend "Texaco Exploration and Production Inc." at the top. There is no evidence to explain why Texaco, which was not the owner of the property, posted these signs. Several years after the Dunhams came into ownership of the Graham Way property, in 1999, they posted their own signs pursuant to section 1008.

In December 1999, the Dunhams learned that the Fullertons had listed the Tompkins Hill property for sale, stating in the listing that there were two modes of access to the property. In response, the Dunhams retained an attorney to write a letter to the Fullertons revoking permission to use the Texaco Road by the Fullertons and any purchaser of the Tompkins Hill property. When showing their home, the Fullertons brought all prospects in by way of the old driveway. Accordingly, the Aarons were well aware of this dispute before they purchased the Tompkins Hill property.

Barely a month after moving in, the Aarons filed this declaratory relief action against the Dunhams. Although their complaint articulates no specific legal theory, the prayer seeks a declaration that "plaintiffs have an easement"

over the Texaco Road. The Dunhams cross-claimed to quiet title. Following presentation of the evidence to a jury, the trial court restricted plaintiffs to a claim of prescriptive easement, effectively granting nonsuit on the vague claims for oral easement and estoppel they had articulated during trial.[3] Completing a detailed special verdict form, the jury then found (1) Mr. Jen's use of Texaco Road was by permission; (2) Mr. Bush's use of the road was adverse, open and notorious, and continuous; (3) the Fullertons' use of the road was adverse, open and notorious, and continuous; (4) continuous, uninterrupted, nonpermissive use of the road had occurred at least from 1990 to 1995; (5) section 1008 signs were first posted by Texaco in 1992; and (6) section 1008 signs were first posted by the Dunhams in 1999. After considering submissions from the parties and conducting further factual hearings, the trial court concluded that the jury's verdict required a finding that the Aarons had acquired a prescriptive easement and entered judgment accordingly.

## III. DISCUSSION

The Dunhams contend that the trial court erred in concluding that the sign posted by Texaco pursuant to section 1008 did not preclude the acquisition of prescriptive rights as a result of the Fullertons' use and that the jury's conclusion that the Bushes' and Fullertons' use of the Texaco Road was adverse was not supported by the evidence.

### A. *Section 1008*

The jury found that a sign or signs were posted on the property pursuant to section 1008 in 1992 by Texaco. If this sign were legally operative, it would have prevented the Fullertons' use, which the jury found to have occurred from 1990 through 1995, from ripening into a prescriptive easement because the Fullertons had not been using the Texaco Road for the five-year statutory period at the time the signs were erected. Following the literal language of the statute, however, the trial court ruled that the signs were not legally operative because they had not been posted by the landowners, the Dunhams.

■ "The elements necessary to establish a prescriptive easement are well settled. The party claiming such an easement must show use of the property which has been open, notorious, continuous and adverse for an uninterrupted period of five years." (*Warsaw v. Chicago Metallic Ceilings, Inc.* (1984) 35 Cal.3d 564, 570 [199 Cal.Rptr. 773, 676 P.2d 584].) The term "adverse use" "means only that the owner has not expressly consented to [the use] by lease or license . . . ." (E.g., *Felgenhauer v. Soni* (2004) 121 Cal.App.4th 445, 450

---

[3] The Aarons do not challenge these rulings on appeal.

[17 Cal.Rptr.3d 135] (*Felgenhauer*).) Whether the elements of prescriptive use have been established is ordinarily a question of fact, reviewed under the substantial evidence standard. (*Ibid.*)

■ Enacted in 1965 (Stats. 1965, ch. 926, § 1, p. 2540) and unofficially entitled "Title by prescription; permissive use," section 1008 states: "No use by any person or persons, no matter how long continued, of any land, shall ever ripen into an easement by prescription, if the owner of such property posts at each entrance to the property or at intervals of not more than 200 feet along the boundary a sign reading substantially as follows: 'Right to pass by permission, and subject to control, of owner: Section 1008, Civil Code.' " The posting of a sign pursuant to section 1008, by giving express notice to the world, as it were, that it has permission to pass upon the land, defeats any claim of adverse use. (E.g., *Applegate v. Ota* (1983) 146 Cal.App.3d 702, 710 [194 Cal.Rptr. 331].)

The limited legislative history of section 1008 supports this interpretation, suggesting that the statute was enacted to provide a simple and foolproof way for landowners, particularly shopping mall owners, to insulate their land from prescriptive claims. A contemporary commentary states, after reviewing the elements of a claim of prescriptive easement: "These requirements have led to two principal self-help methods by which landowners endeavor to prevent acquisitive prescription: (1) periodic interruption of the tolerated use; and (2) posting of signs importing the permissive nature of the use. Some shopping center owners, for example, close off their parking lots annually, at considerable expense to themselves and inconvenience to their patrons. Posting of signs for the same purpose is also a time-honored custom. [Citation.] [¶] . . . [¶] This new enactment, sponsored by the International Council of Shopping Centers, appears to provide an equally simple procedure by which the landowner can conclusively insulate his property from prescriptive rights." (Review of Selected 1965 Code Legislation (Cont.Ed.Bar 1965), pp. 48–49.)

Because the Fullertons' use continued for no more than three years before Texaco erected its sign,[4] two years short of the statutory minimum, a claim of prescriptive easement could not be based on the Fullertons' use if the Texaco sign was effective for the statutory purpose. Although we have not found any statement of the trial court's reasoning in the record, its ruling that the sign did not protect the Dunhams against a claim of prescriptive easement was apparently based on the very specific language of the statute: "No use by any person or persons . . . of any land, shall ever ripen into an easement by prescription, if *the owner* of such property posts" the statutory signs. (§ 1008,

---

[4] The Fullertons purchased in 1989. Although the evidence at trial was vague as to the exact time the section 1008 signs were posted by Texaco, the Aarons do not challenge the jury's factual finding that they were posted in 1992—essentially at the midpoint of suggested dates.

italics added.) A literal reading of the statutory language leads inescapably to the trial court's conclusion. The statute specifically states that a prescriptive easement cannot be obtained if the property owner posts an appropriate sign. Here, it was a lessee who posted the sign, and the sign was labeled with the name of the lessee, not the owner.

 Courts ordinarily defer to the literal language of a statute. " 'It is a prime rule of construction that the legislative intent underlying a statute must be ascertained from its language; if the language is clear, there can be no room for interpretation, and effect must be given to its plain meaning. [Citations.] "An intent that finds no expression in the words of the statute cannot be found to exist. The courts may not speculate that the legislature meant something other than what it said. Nor may they rewrite a statute to make it express an intention not expressed therein." ' [Citation.]" (*Mutual Life Ins. Co. v. City of Los Angeles* (1990) 50 Cal.3d 402, 412 [267 Cal.Rptr. 589, 787 P.2d 996].) Like so many of the rules of statutory construction, however, this one has an exception. " 'The literal meaning of the words of a statute may be disregarded to avoid absurd results or to give effect to manifest purposes that, in the light of the statute's legislative history, appear from its provisions considered as a whole.' " (*County of Sacramento v. Hickman* (1967) 66 Cal.2d 841, 849, fn. 6 [59 Cal.Rptr. 609, 428 P.2d 593].)

 We do not believe that a literal reading of the statute leads to absurd results or that the Dunhams' interpretation is necessary "to give effect to manifest purposes" of the statute, particularly in these circumstances. The function of a sign erected pursuant to section 1008 is to give notice to the public that permissive use of the property has been granted. Because the owner of the property is presumptively the sole person or entity with the legal authority to grant such permission, it is reasonable to require that the sign have been posted by the owner. A sign posted by a person or entity other than the owner is of dubious value, since the party posting the sign is not the party vested with the legal authority to grant that permission. This is a case in point. Although Texaco posted a sign pursuant to section 1008, Texaco was a mere lessee.

While the Dunhams state that "it is the duty of lessee [Texaco] under the 1934 agreement to post . . . that all rights are by permission and subject to control of owner," they cite to no principle of law or provision of the lease supporting that contention. Our own review of the lease finds no such requirement.

The Dunhams also argue that Texaco was acting as their agent when posting the sign. We assume, without deciding, that section 1008 extends to signs posted at the direction of the landowner, in addition to those actually

posted by the landowner. There is no evidence in the record, however, to suggest that Texaco was acting as an agent for, or even with the awareness of, the owners when it posted the sign. Neither Mrs. Dunham nor her sister, who were partial owners at that time, testified that they had discussions with Texaco about the sign; on the contrary, it appears to have been posted entirely on the initiative of Texaco.

In the absence of an absurd result, we cannot disregard the statutory language. Because the sign was not posted by the owner or an authorized agent, as required by section 1008, it did not prevent the Fullertons from acquiring prescriptive rights.

### B. *The Fullertons' Adverse Use*

The Dunhams claim that the Aarons failed to prove that the Fullertons' use of the Texaco Road was "adverse," a term synonymous with use "under claim of right" and "hostile" use. (E.g., *Harrison v. Welch* (2004) 116 Cal.App.4th 1084, 1090 [11 Cal.Rptr.3d 92].) "Adverse use" means only that the claimant's use of the property was made without the explicit or implicit permission of the landowner. As explained in *Felgenhauer*: "Claim of right does not require a belief or claim that the use is legally justified. [Citation.] It simply means that the property was used without permission of the owner of the land. [Citation.] As the American Law of Property states in the context of adverse possession: 'In most of the cases asserting [the requirement of a claim of right], it means no more than that possession must be hostile, which in turn means only that the owner has not expressly consented to it by lease or license or has not been led into acquiescing in it by the denial of adverse claim on the part of the possessor.' (3 Casner, American Law of Property (1952) Title by Adverse Possession, § 5.4, p. 776.)" (*Felgenhauer, supra,* 121 Cal.App.4th at p. 450; see also *Warsaw v. Chicago Metallic Ceilings, Inc., supra,* 35 Cal.3d at pp. 571–572 ["continuous use of an easement over a long period of time without the landowner's interference is presumptive evidence of its existence and in the absence of evidence of [express] permissive use it will be sufficient to sustain a judgment"].)

The Fullertons' testimony was unequivocal that they never spoke to the owners of the Graham Way property about using the Texaco Road until near the end of their ownership of the Tompkins Hill property, well after the period found by the jury to constitute the statutory period of prescriptive use. Necessarily, their use of the road was made without express permission, qualifying it as adverse use under *Felgenhauer.*

The Dunhams cite *Jones v. Tierney-Sinclair* (1945) 71 Cal.App.2d 366 [162 P.2d 669], which holds that adverse use requires "a claim of right

expressly communicated, or under such circumstances that knowledge of the claim of right . . . must be imputed to the owner of the servient tenement." (*Id.* at p. 369.) If there is any tension between this principle and that of *Felgenhauer,* it was resolved in *Warsaw v. Chicago Metallic Ceilings, Inc., supra,* 35 Cal.3d at p. 571, in which the Supreme Court held, in effect, that continuous use over a long period of time constitutes communication of the claim of right. Although the Dunhams argue that the "Fullertons were using as Jens had used, neighborly with permission," there was never any testimony that the Fullertons either requested or received express permission from their neighbors. The testimony was sufficient to demonstrate adverse use under *Felgenhauer.*

Because we find adverse use by the Fullertons, we need not address the Dunhams' claim that the Aarons failed to demonstrate adverse use by the Bush family.

### C. *The Admission of Testimony Regarding Alternate Access*

The Dunhams contend that the trial court improperly admitted testimony by an expert witness and Mr. Aaron regarding the difficulty of gaining access to the Tompkins Hill property by way of the old driveway. In order to gain a new trial as a result of the admission of this testimony, the Dunhams were required to show that "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) In making that judgment, we must " 'determine whether prejudice actually occurred in light of the entire record.' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801–802 [16 Cal.Rptr.3d 374, 94 P.3d 513].)

We find no possible prejudice from the admission of this evidence. As noted *ante,* there was essentially undisputed testimony that the Fullertons had used the Texaco Road in an open and public manner for far longer than the statutory period without obtaining express permission from the owners, thereby satisfying the requirements for a prescriptive easement. Accordingly, we find little probability that, in the absence of the allegedly improper testimony, the jury's verdict would have been more favorable to the Dunhams.

### D. *The Injunction*

In entering an injunction to define the parties' rights with respect to the prescriptive easement, the trial court entered an order permitting the maintenance of various locked gates by the parties. Without ever stating what portion of the trial court's subsequent order was in error or should be

modified, the Dunhams contend that the order "open[ed] up the use to an unlimited easement." We find no abuse of discretion in the trial court's injunction, which permits ordinary residential access by the Aarons while protecting the Dunhams' ability to use the property for livestock.

## IV. DISPOSITION

The judgment of the trial court is affirmed.

Marchiano, P. J., and Swager, J., concurred.

Appellants' petition for review by the Supreme Court was denied June 21, 2006, S142655.