Filed 12/16/20  Sonoma Land Trust v. Thompson CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SONOMA LAND TRUST, | |
| Plaintiff and Respondent, | A157721 |
| v. | |
| PETER THOMPSON, ET AL., | (Sonoma County |
| Defendants and Appellants. | Super. Ct. No. SCV-258010) |

Peter and Toni Thompson owned approximately 34 acres of land near Glen Ellen, California, burdened by two easements (the Easement Property). One easement allowed Pacific Gas & Electric Company (PG&E) to maintain power lines over a strip of the property and to trim, cut down and carry away trees on that strip (PG&E Easement).  A later conservation easement (Civ. Code, § 815), granted in favor of respondent Sonoma Land Trust (Trust), precluded the Thompsons from, among other things, removing or destroying trees (Conservation Easement).  The Thompsons nonetheless decided to uproot and carry off three mature oak trees from the Easement Property to an adjoining property where they lived, causing the death of those trees and extensive damage to the land covered by the Conservation Easement.  The Trust sued the Thompsons and their entity, Henstooth Ranch LLC, who

1

insisted that PG&E had authorized the removal of one of the oaks. The trial court determined there could be no such authorization as a matter of law and, after a trial, entered judgment in favor of the Trust.

The Thompsons and Henstooth Ranch LLC appeal, contending the court erred by (1) excluding evidence that PG&E gave them permission to cut one or more trees on the PG&E Easement; (2) allowing a PG&E contractor to testify on behalf of the Trust and using that testimony to find that PG&E had *not* granted permission to cut down trees; and (3) denying appellants a continuance of the trial date. We will affirm.

## I. FACTS AND PROCEDURAL HISTORY

### A. The PG&E Easement

In 1960, Benjamin Swig, then-owner of the Easement Property, granted an easement over a 75-foot-wide strip of the property to PG&E. The PG&E Easement gives PG&E "the right to erect, construct, reconstruct, replace, remove, maintain and use a line of towers with such wires and cables as [PG&E] shall from time to time suspend therefrom for the transmission of electric energy, and for communication purposes, and all necessary and proper foundations, footings, crossarms and other appliances and fixtures for use in connection with said towers, wires and cables, together with a right of way, on, along and in all of the hereinafter described strip of those certain lands which are situate in the [property]."

Under the PG&E Easement, PG&E further obtained "the right of ingress to and egress from said strip over and across said lands by means of roads and lanes thereon," the right to mark the location of the strip, and the right to install, maintain and use gates. In addition—as relevant to this appeal—PG&E was granted "the right from time to time to *trim and to cut down and clear away any and all trees and brush now or hereafter on said*

2

*strip* and shall have the further right from time to time to trim and to cut down and clear away any trees on either side of said strip which now or hereafter in the opinion of [PG&E] may be a hazard to said towers, wires or cables, by reason of the danger of falling thereon." (Italics added.)

In 1981, a subsequent owner of the Easement Property granted PG&E a modification of the PG&E Easement, increasing the width of the strip to 167.5 feet so PG&E could build a second line of towers.

The PG&E Easement and amendment bind, and inure to the benefit of, the successors and assigns of the respective parties.

B. <u>The Conservation Easement in Favor of the Trust</u>

In 2009, Peter and Katherine Drake, as trustees of the Drake Family Trust (a subsequent owner of the Easement Property), granted to the Sonoma Land Trust an easement "exclusively for conservation purposes" over the entirety of the 34.18 acre parcel (Conservation Easement), thus overlapping the senior PG&E Easement. The stated purpose for the Conservation Easement was to "preserve and protect forever" the conservation values of the property, including its "natural habitat, scenic, and open space values."[1] Specifically, the goal was to protect oak woodlands and a nearly pristine community of native grasses, forbs, and fragile soils.

To that end, the Conservation Easement prohibits or significantly restricts the property owner from a broad array of activity on the Easement

---

[1] A conservation easement is a designation by a private landowner of their land, or a part of it, to be held in trust by a nonprofit organization, as a permanent limitation on the uses of the land to protect "its natural, scenic, agricultural, historical, forested, or open-space condition." (Civ. Code, § 815.) It constitutes an interest in real property and is binding on successor owners in perpetuity. (Civ. Code, § 815.2, subds. (b), (c).) The Legislature has "declare[d] it to be the public policy and in the public interest of this state to encourage the voluntary conveyance of conservation easements to qualified nonprofit organizations" such as the Trust. (Civ. Code, § 815.)

3

Property, including building roads, causing soil degradation or erosion, dumping waste, excavating or altering the contour of the property, and the "pruning, cutting, removal, or destruction of any tree." It allows only passive uses, such as hiking, unless the landowner obtains prior written permission from the Trust.

The Conservation Easement further provides that "Grantor shall confine its use of the Property to activities and uses that are consistent with the terms, conditions and Conservation Purpose of this Easement," and "[a]ny activity or use that is inconsistent with the terms, conditions and Conservation Purpose of this Easement is prohibited." The Trust has "the right to enter the Easement Property as necessary to enforce the Easement."

C. The Thompsons Acquire the Property

In 2013, the Drakes sold the Easement Property, as well as an adjacent parcel that included a vineyard (Henstooth Property), to the appellants in a single transaction.[2] Appellants completed the purchase with knowledge of the Conservation Easement, obtaining the Easement Property at a discount due to its restrictions.

In 2014, appellants started construction of a new house, pool, outbuildings, and landscaping on the Henstooth Property. Appellants' landscape plan called for two large "specimen" oaks in the front and rear of the home. Where would appellants obtain those oaks? They turned to the land that was the subject of the Conservation Easement.

_____

[2] More precisely, the Drakes, as trustees of the Drake Family Trust, conveyed the Easement Property to Peter S. Thompson and Toni H. Thompson, Trustees of the Amended and Restated Thompson Family Living Trust. Dragonleaf Limited, a California limited partnership managed by Katherine Drake, granted the adjacent parcel to Henstooth Ranch, LLC, a California limited liability company.

4

D.  The Thompsons Try to Move Protected Trees to Their New House

Despite the prohibitions set forth in the Conservation Easement, appellants decided to uproot trees from the Easement Property and replant them in the landscape of their new abode.  They hired Hess Landscape Construction, which bulldozed a haul road one-third of a mile down the length of the Easement Property, so the trees could be dragged or carted from one property to the other.  In grading the road, they destroyed a fragile community of native plants, changed the contours of the hill and introduced erosion, and removed 12 more trees.

Appellants then uprooted, "rootballed," and dragged an oak tree—later named the Dead Tree—from the Conservation Easement to a location near their new house.  The Dead Tree did not survive relocation, so appellants had it cut up and hauled away.

Appellants attempted to uproot and relocate a second mature oak tree from the Conservation Easement (Boulder Tree), but its roots were wrapped around a boulder, making it impossible to move.  Appellants' attempt to move it killed the tree.

Appellants uprooted and moved a third mature oak tree from the Conservation Easement to the driveway of their home, where they replanted it (Driveway Tree).  While all three of the oak trees had been located within the bounds of the Conservation Easement, only the Driveway Tree had stood in the strip covered by the PG&E Easement.  The Driveway Tree ultimately died from the trauma of relocation.

In addition, at Peter Thompson's direction, another contractor dredged sediments from a pond on the Henstooth Property, dumped them on the Easement Property, and regraded portions of the Easement Property to hide the extent of appellants' activities.

5

Appellants did not notify the Trust of their actions. To the contrary, Peter Thompson directed his contractors to move quickly and block access by a neighbor who had reported his deeds to the local open space authority, which in turn informed the Trust. After the Trust contacted him, Thompson texted his contractor: "If u c the neighbor, instruct all ur guys to boot his ass off or anyone else u c up there!!! No more b[e]ing polite."

E. The Trust Investigates

The Trust learned of activity on the Easement Property in October 2014 and asked to visit the site, as it was entitled to do under the Conservation Easement. Appellants put off the Trust a few days, while representing that they were working in collaboration with PG&E to mitigate tree loss, and that they had agreed to relocate a tree in order to save it (a representation the trial court would later deem to be "a lie"). This delay bought appellants a few days to move the trees to evade discovery by the Trust, with Peter Thompson texting the contractors "Is tree set? Someone called land preserve people on me. When is big tree coming down?" and "If u guys didn't take so long we would've been under the radar!!!"

Trust staff finally gained partial access to the Easement Property on October 28, 2014. Peter Thompson escorted the Trust's Stewardship Director, Robert Neale, and the Trust's Conservation Easement Program Manager, Crystal Simons, to part of the Easement Property. The Driveway Tree was the only tree that appellants appeared (or admitted) to be moving at that time. As shown by a contractor invoice for the day of the site visit, however, appellants had already destroyed the Dead Tree and regraded to hide their destruction of the Boulder Tree.

Even at that, Neale and Simons were "completely stunned" and "shocked" at the magnitude of the work and destruction they witnessed on

6

the Easement Property. The Driveway Tree sat "limbed with chains and ropes around it . . . to secure it to the root ball" for loading "onto the steel plate" with bulldozers, trucks, and heavy equipment parked around it.

Peter Thompson tried to explain the scene by representing to Neale and Simons that PG&E was going to severely trim or top the Driveway Tree and he was trying to "save it." Neale told Thompson in response that if appellants had asked the Trust's permission, the Trust would not have approved the activity, and would have instead worked with PG&E to resolve the matter. It did not occur to Neale at the time that Thompson was lying. Simons wanted to see other portions of the area, but Thompson refused.

Neale and Simons asked Peter Thompson to provide contact information for "Greg," the PG&E contractor who allegedly told him that PG&E planned to cut the Driveway Tree. Despite repeated requests, appellants did not provide the Trust with this information.

On October 29, 2014, Simons emailed appellants and asked to return to the site to document the haul road and the areas she had not been able to see. She also requested any correspondence and contact information regarding PG&E's intent to trim the Driveway Tree. Peter Thompson deflected her attempts for weeks. After Simons announced her intention to visit the property pursuant to the terms of the Conservation Easement in November 2014, Thompson threatened to report her action as a trespass and consult with his attorney "about appropriate actions that are available to me against you, personally, and against the Land Trust." When Simons tried to visit, appellants physically barred her from entering.

In November 2014, Neale met with Peter Thompson to defuse the situation and learn about appellants' activities. Neale asked Thompson if he

had cut another tree down or tried to move another tree. Thompson looked Neale in the face and said "no."

By the time appellants let Simons enter the site again on November 25, 2014, they had regraded and hydroseeded the entire haul road to cover up the full extent of their activities, without the Trust's knowledge or permission. This further harmed the Easement Property by failing to control erosion and introducing nonnative grasses.

F. The Trust Issues a Notice of Violation

In December 2014, the Trust issued a Notice of Violation that identified the known violations of the Conservation Easement and the steps to remedy them. (The Trust did not learn of the Boulder Tree or Dead Tree until discovery in the ensuing litigation.)

Appellants initially said they would work with the Trust to restore the Easement Property, but ultimately refused to engage in good faith restoration efforts. In July 2015, they hired a restoration contractor, Michael Jensen, to recommend the steps for restoring the Easement Property. Jensen eventually presented these recommendations, and Trust staff reviewed them. On November 5, 2015, the Trust wrote defendants a letter conditionally approving the steps described by Jensen, subject to additional requirements. Peter Thompson responded, "You have to be kidding with this???" Appellants refused to restore the property in conformity with the Trust's conditional approval.

G. The Trust Sues Appellants

The Trust filed suit against appellants in November 2015, alleging their activities violated the Conservation Easement and Civil Code section 815.7, and seeking damages and injunctive relief.

Throughout the litigation, appellants continued to obstruct the Trust's efforts to investigate their actions, misrepresented PG&E's actions and Trust staff's statements, withheld "Greg's" contact information, refused to produce documents and answer interrogatories, refused to appear for their depositions, and physically ejected Trust staff and experts from the Easement Property during a properly noticed inspection.

### 1. Trial Setting

Trial was initially set to begin on June 2, 2017. Appellants filed 18 motions in limine, oppositions to the Trust's nine motions in limine, and replies in support of their motions. When the parties appeared for trial, no courtrooms were available, and trial was reset for October 27, 2017.

During the intervening months, appellants' attorneys obtained an order allowing them to withdraw from their representation, and wildfires burned significant portions of Sonoma County. The court continued the trial and scheduled a conference for January 31, 2018.

Attorney Gary Gorski began representing appellants in early 2018. At the trial setting conference on January 31, 2018, Gorski was unable to agree to a trial date earlier than July 27, 2018—more than 13 months after the original trial date—due to his existing trial and vacation plans. The Trust, having proposed several earlier dates, agreed to the July 27 trial date but informed appellants and the court that its lead trial attorney had travel plans beginning August 27, 2018, and a delay in the start of trial would conflict with those plans and disrupt the trial. The court set the trial for July 27, 2018.

### 2. Appellants' Attorney Seeks a Continuance on the Eve of Trial

On July 24, 2018—three days before the July 27, 2018 trial call— Gorski filed a motion requesting a continuance of the trial for five court days,

stating that an order relating to his family had been issued on July 19, 2018 in a Contra Costa County juvenile dependency proceeding. He asserted: "There has been a material change in family relations as a result of the order, resulting in substantial interference with Counsel's ability to provide effective counsel to defendants." He added: "Because of the confidential nature of the Dependency Proceeding (e.g. Welfare and Institutions Code section 827), Counsel for defendants cannot disclose the nature of the proceeding, other than it personally affects Counsel, and Counsel is willing to explain the nature of it *in camera.*" An accompanying declaration noted that Gorski was a solo practitioner and there was "no other counsel available to substitute in." It also advised that appellants were agreeable to his continued representation of them "only if the 5-court day continuance is granted so that I can adequately prepare with my clients and be available at trial."

The Trust opposed the continuance, noting that, as explained when the trial date was set, its lead counsel had a conflict from August 27 through September 3. The Trust also argued it was unclear how much the requested continuance was due to the family emergency, as opposed to Gorski's tardiness in preparing for trial.

At the July 27, 2018 trial call, the court acknowledged that Gorski set forth the basis of his motion "as best he could, without going into confidential privileged information." The court explained its tentative decision to deny the motion, finding no good cause in light of the lengthy procedural history of the case, while noting that court would be in session only from 8:30 a.m. to 1:30 p.m., Tuesday through Friday.

The court then invited Gorski to respond. Gorski stated he could not be effective because he "could not be here on certain days" due to "things going

10

on," his clients were willing to waive a jury, motions in limine could be addressed as the trial proceeded, and he could be ready for trial by August 3 or August 6. The court reiterated that it was inclined to deny the continuance, with the understanding that the trial would not likely start until Tuesday or Wednesday of the following week (July 31 or August 1), but asked Gorski if we wanted to be heard further. Gorski replied, "No, Your Honor." The court denied the motion. The matter proceeded to a bench trial.

3. <u>Order in Limine Excluding Evidence of PG&E Authorization</u>

Before the earlier trial setting, the Trust had moved in limine to exclude evidence or argument that a representative of PG&E allowed Peter Thompson to relocate any of his oak trees growing near or within the PG&E easement. The Trust argued that PG&E could not, as a matter of law, authorize others to act outside the scope of its own authority: PG&E's rights under its utility easement were limited to actions necessary to maintain and use its power lines, and PG&E could not relocate trees because that would not serve PG&E's narrow interest. Appellants opposed the motion, insisting that the PG&E Easement allowed PG&E to cut down and clear trees on its easement without limitation.

At the in limine hearing on August 1, 2018, the court ruled that PG&E would not have had the right under its utility easement to "remove a tree for a landscaping purpose, to dig that tree up, and then to move it to an adjacent property or to another location on a property for landscaping." It further ruled that PG&E did not "have any authority to transfer that utility easement authority to . . . the Thompsons" to relocate the tree without the Trust's approval. On this basis, the court excluded "any evidence that there was an agreement . . . between PG&E and the defendants that excused and allowed for the relocation of the trees."

11

### 4. Order During Trial Allowing Greg Wheeldon's Testimony

After the trial began, appellants moved for an order excluding further evidence of any role PG&E had in regard to matters relating to the Conservation Easement, including discussions with the now-identified Greg Wheeldon who had supposedly told Peter Thompson that PG&E authorized him to relocate the Driveway Tree.

In response, the Trust's attorney made an offer of proof that, contrary to what appellants had been claiming for years, Wheeldon had *not* authorized appellants to remove the Driveway Tree, and in fact he had told Thompson that PG&E was probably *never* going to trim that tree because it was at least 150 years old, was 55 feet away from the power lines, and would grow only two to three inches a year. Wheeldon's testimony was thus relevant to Peter Thompson's credibility, and Thompson's statements to the Trust about PG&E's alleged authorization related to appellants' defenses that the Trust failed to mitigate damages (by not telling appellants to stop their relocation of the Driveway Tree immediately) and that the Trust incurred unreasonable staff costs in investigating the matter.

The court ruled that it would allow Wheeldon's testimony for the limited purpose of the credibility of Peter Thompson. The court clarified that Wheeldon's testimony would not "have any bearing on the legal ability of PG&E to somehow, again, transfer or convey [its] rights under this Easement."

The Trust later called Wheeldon as a witness. He confirmed that he did not tell Peter Thompson that PG&E was going to trim the Driveway Tree. To the contrary, Wheeldon testified, "I told him my assessment of the tree, based on the amount of clearance and the yearly growth rate of the tree, that the tree would, in my opinion, probably not need to be trimmed, most likely,

12

in the lifetime of the tree." Wheeldon further testified that in September 2016 he had a telephone conversation in which Peter Thompson said he needed Wheeldon's help and wanted him to tell the Trust that Wheeldon had granted him permission to move the tree; Wheeldon told Thompson he could not do so, because he had not said that.

After Wheeldon testified, Peter Thompson admitted on the stand that his representation to Neale about "events involving the relocation of a very old oak tree that was marked for topping by PG&E" was "a false statement." In fact, Thompson confessed, he had not talked to Wheeldon about relocating "a very old oak tree that was marked for topping by PG&E."

### 5. The Trust's Evidence of Damage and Appellants' Scheme

Over the course of the 19-day trial, percipient and expert testimony, photographs, maps, and contemporaneous correspondence and reports recounted the facts summarized *ante* and demonstrated the severity of the harm that appellants caused to the Easement Property. Cost estimates for repairing the damage, including a five-year remediation plan, amounted to more than $500,000. The trial also included extensive testimony about appellants' planning, execution, and cover-up of their violations of the Conservation Easement.

### 6. The Trial Court's Findings and Judgment

The court announced its decision in open court on October 10, 2018, taking about two hours. A proposed statement of decision was submitted on January 23, 2019, and a 56-page Final Statement of Decision was issued on April 16, 2019.

The Final Statement of Decision found that the testimony and evidence demonstrated "the truly extraordinary nature and extent of harm to the Easement Property," noting the vegetation and soils on the property had

13

"evolved over thousands of years with minimal disturbance."  Based on "overwhelming" evidence, the court found that appellants violated the Conservation Easement and that their defenses were meritless, and it held all three appellants jointly and severally liable for the harm to the Easement Property.

The court specifically found that "neither Mr. Wheeldon nor any other representative of PG&E told Mr. Thompson that PG&E planned to trim or remove the Driveway, Boulder, or Dead Tree.  Nor did Mr. Wheeldon or any other representative of PG&E give or purport to give Mr. Thompson permission to remove or relocate any tree on the Easement Property."  The court noted that Wheeldon's testimony on this point was "specific, consistent, and credible" and his "demeanor at trial was both honest and direct."  "In sharp contrast, Mr. Thompson admitted during trial that he had not always provided an honest account of his interactions with Mr. Wheeldon and that his verified response to Trust's interrogatories . . . was false," and his "testimony regarding these communications was evasive and incomplete."

The court made other credibility determinations, finding that Neale and Simons "testified with specific, consistent, and credible detail regarding their conversations and written communications with Mr. Thompson," but "Mr. Thompson's testimony was evasive, incomplete, and at times plainly false regarding these same communications."  The court observed that Thompson's "ability to recall details and his willingness to answer questions during trial were starkly different depending on whether the answers were favorable to his account."  The court added:  "Peter Thompson also lied in the October 28 email to Ms. Simons, in which he stated:  'We agreed to relocate this tree to save it from being topped and ruined aesthetically . . . We understood too that our relocating the tree would likely spare it from dying.'

14

. . . He lied again when he said that 'he would put a call into the contractor to see where they are at in the process and relay your message.'" "And defendants continued to allege in Court filings up to the date of trial that they had to move the Driveway Tree to save it."

The court further explained that appellants' defenses failed "for the additional reason that defendants have little credibility and no documentary or photographic support. The vast majority of the testimony on cross-examination of Peter and Toni Thompson, Joseph Lunny, Loretta Murphy, and Alexander Bannon was misleading, evasive, inconsistent with deposition testimony, or outright false." Although at trial Peter Thompson denied asking Wheeldon to lie to the Trust and denied telling Simons and Neale in October 2014 that he had to move the Driveway Tree to save it from PG&E, the court found, "based on the weight of the evidence and the credibility of the respective witnesses, that both denials were false." The court continued in this vein, providing specific examples with citations to the record.

The court awarded the Trust $575,899, including $392,670 for the cost of restoring the property, $73,800 for the three large oak trees, and $92,286 for costs of the Trust staff's time enforcing the Conservation Easement, as well as $90,943 for expert witness costs. The court also issued a permanent injunction requiring appellants to let the Trust access the property and take steps to restore it.[3] Judgment was entered on April 25, 2019.

H. Appellants' Post-Trial Motions

In May 2019, represented by new counsel, appellants filed a motion for a new trial (Code Civ. Proc., § 657) and a motion to set aside the judgment

---

[3] The trial court later awarded the Trust $2,961,264.29 for its attorney fees and expenses, which is the subject of another appeal pending in this court (A159139).

(Code Civ. Proc., § 663). The motion to set aside the judgment was based on arguments not asserted in this appeal, so we do not address it.

Appellants' new trial motion made numerous arguments, two of which have some bearing here. Appellants asserted (1) the court erred in excluding testimony relating to PG&E's Easement and its alleged authorization of appellants to remove trees; and (2) attorney Gorski was "surprise[d]" by the dependency order of July 19, 2018, which forced him to take care of his daughter and kept him from sufficiently preparing witnesses and gearing up for trial, and the court should have granted a continuance.

Gorski submitted a declaration in support of the new trial motion. In that declaration, he referenced another declaration he had filed on or about April 4, 2019, several months *after* the trial testimony had ended. In his April 2019 declaration, he revealed that the July 19, 2018 dependency order had granted him full legal and physical custody of his estranged 12-year-old daughter. As a result, he could not stay with the Thompsons in Santa Rosa during the trial as planned, and he had to commute "5 to 9 hours per day" between his residence in Folsom and the courthouse in Santa Rosa. Although he scheduled family therapy and social worker meetings on non-trial days, his daughter had medical appointments, IEP meetings, and other "educational issues and logistics" that took him away from the case, leaving him unable to meet with witnesses as contemplated and without time to review notes and exhibits. "To be very clear," Gorski averred, "the single most significant factor impeding my ability to provide effective assistance of counsel was the fact that I had to commute to court because I could not leave my daughter home alone." He again asserted that he could not go into great detail due to the confidential nature of the dependency proceeding, but

offered to explain in camera "if there is any question how this situation materially altered" his representation.

In his declaration in support of the new trial motion, Gorski added that he had not initially realized the impact the dependency order would have on his availability to represent the Thompsons in the trial.

On June 28, 2019, the court heard argument on the motions and denied them from the bench. The court found no error in law, surprise, newly discovered evidence, or other ground on which to grant a new trial or set aside the judgment. A written order denying the motions was entered on August 12, 2019.

I. <u>Appeal</u>

On July 3, 2019, appellants filed a notice of appeal from the judgment. Appellants' opening brief contends they appealed from the denial of the new trial motion. That is incorrect.

## II. <u>DISCUSSION</u>

Appellants do not challenge the finding that they caused extensive damage by removing trees and doing other acts contrary to the Conservation Easement. Instead, they contend the court should have (1) allowed them to present evidence that PG&E had authorized appellants to remove the Driveway Tree pursuant to the PG&E Easement, (2) not used Wheeldon's testimony to find that no one from PG&E gave such authorization, and (3) granted a continuance of the trial. Their arguments are without merit.

A. <u>Exclusion of Evidence of PG&E Authorization</u>

Appellants first contend the court erred by ruling in limine that they could not introduce evidence "concerning PG&E's authorization" to remove

17

"one or more" trees subject to the PG&E Easement.[4] Their theory is that PG&E was entitled under its easement to trim, cut down, and clear away trees from the strip of land subject to its easement; PG&E retained this right because the PG&E Easement is senior to the Conservation Easement (see *Pasadena v. California-Michigan Land & Water Co.* (1941) 17 Cal.2d 576, 583); and PG&E could authorize others to act on its behalf. On this basis, appellants urge, if PG&E authorized appellants to remove the Driveway Tree, appellants would not be liable for violating the Conservation Easement (as to that tree), and so the evidence was relevant.

Appellants' argument is meritless. As a matter of law, the court was correct in concluding that the PG&E Easement did not empower PG&E to uproot trees to landscape a home or authorize appellants to do so. As a matter of the evidence, any error in this regard would have been harmless anyway, because it became clear from the testimony that appellants' representations of such an authorization were untrue.

    1. Scope of the PG&E Easement

Easements convey an interest in real property limited to a "specific, limited, definable use or activity upon another's property." (*Mesnick v. Caton* (1986) 183 Cal.App.3d 1248, 1261.) The easement can be used only for its intended purposes. (*Main Street Plaza v. Cartwright & Main, LLC* (2011) 194 Cal.App.4th 1044, 1054; *Kerr v. Brede* (1960) 180 Cal.App.2d 149, 151.) For an express easement such as PG&E's, the text of the grant defines those

---

[4] Despite appellants' reference to "one or more" trees, the only oak at issue is the Driveway Tree. As the trial court noted, "[t]estimony showed that the Driveway Tree originally stood at the edge of PG&E's easement but the Dead and Boulder Trees were located on portions of the Easement outside of PG&E's utility easement." Peter Thompson thought the Dead Tree was in PG&E's "right-of-way," but he admitted that the Dead Tree was not part of his discussion with Wheeldon.

uses.  (*County of Sacramento v. Pacific Gas & Elec. Co.* (1987) 193 Cal.App.3d 300, 313; Civ. Code, § 806 ["The extent of a servitude is determined by the terms of the grant"]; *City of Pasadena v. California-Michigan Land & Water Co., supra,* 17 Cal.2d at p. 579 [easements convey "only those interests expressed in the grant and those necessarily incident thereto"].)

Where, as here, there is no extrinsic evidence as to the meaning of the easement language, the interpretation is a question of law we review de novo. (*McManus v. Sequoyah Land Associates* (1966) 240 Cal.App.2d 348, 354; *T-Mobile West LLC v. City and County of San Francisco* (2019) 6 Cal.5th 1107, 1117.)  Because we construe the easement using the rules employed for interpretation of a contract, we must "give effect to the intent of the parties as expressed in the language of the instrument as a whole."  (*Concord & Bay Point Land Co. v. City of Concord* (1991) 229 Cal.App.3d 289, 294.)

Here, the language of the PG&E Easement tells us that PG&E obtained "the right to erect, construct, reconstruct, replace, remove, maintain and use a line of towers with such wires and cables as [PG&E] shall from time to time suspend therefrom for the transmission of electric energy, and for communication purposes, and all necessary and proper foundations, footings, crossarms and other appliances and fixtures for use in connection with said towers, wires and cables, together with a right of way, on, along and in all of the hereinafter described strip of those certain lands which are situate in the [property]."  Other rights were granted to support such use, including the right of ingress to and egress from the strip, the right to install, maintain and use gates, the right to mark the location of the strip,  and "the right from time to time to trim and to cut down and clear away any and all trees and brush now or hereafter on said strip" and "to trim and to cut down and clear away any trees on either side of said strip which now or hereafter

19

in the opinion of [PG&E] may be a hazard to said towers, wires or cables, by reason of the danger of falling thereon."

Viewing the text as a whole, the plain purpose of the PG&E Easement was for PG&E to obtain the right to use a strip of land in order to construct and maintain towers for energy transmission and communication, together with such additional rights—including the right to trim and cut down and carry away trees on that strip—as needed for that purpose.

Appellants argue that the easement's reference to " 'purposes of energy transmission' " describes only what the wires on the towers were for, and PG&E's right " 'to cut down and clear away any and all trees and brush now or hereafter on said strip' " is not so limited. In fact, the right to cut down and clear away any and all trees and brush *on* the strip is granted without qualification, while the right to cut and clear away trees outside the strip is limited to trees that PG&E believes to be "a hazard to said towers, wires or cables, by reason of the danger of falling thereon."

Appellant's argument is unavailing. PG&E was a utility company, and the only purpose indicated in the easement document was for PG&E to maintain power lines. Nowhere in the PG&E Easement is there any language that PG&E could trim, cut down and clear away trees for some other purpose, and it would be unreasonable to conclude that PG&E could take such actions for the purpose of landscaping some other parcel of land. The fact that PG&E's right to cut and clear trees outside the strip was limited to trees posing a hazard to PG&E towers, wires, and cables only confirms that the overall purpose of the PG&E Easement was to protect and maintain those PG&E facilities and nothing else.[5]

---

[5] Even appellants' trial counsel seemed to agree at the in limine hearing that PG&E's rights were limited to its use of the power lines. Gorski argued that PG&E could not do just anything it wanted, such as using a "defoliage"

Moreover, by its terms, the PG&E Easement allows PG&E only "to *trim and to cut down and clear away*" trees. (Italics added.) It does not state that PG&E can do what appellants did here—excavate the land, uproot the tree, bulldoze a haul road outside the easement to a destination away from PG&E's lines, and replant the tree on another parcel of property. To the contrary, PG&E's access to its easement is expressly limited to "such route . . . as shall occasion the least practicable damage."

Because PG&E had no right under the PG&E Easement to uproot, drag, and relocate trees from the Easement Property to the Henstooth Property to satisfy appellants' landscaping fancy, it had no right to authorize appellants to do that either. (See *Gurnsey v. Northern California Power Co.* (1911) 160 Cal. 699, 707.) And because PG&E had no right to authorize appellants to move the Driveway Tree, any evidence that it did was irrelevant. Accordingly, the court did not err in excluding evidence "that there was an agreement between PG&E and the defendants that excused and allowed for the relocation of the trees."[6]

---

chemical to kill the grass, because the grass poses no danger to PG&E's lines. He stated: "I think you have to show that there's *some reasonable danger that the brush or the trees posed to the transmission lines*, whether it's causing a fire or growing into the lines, or maybe a disruption to foundation like roots, causing a foundation disruption. [¶] And here, in this instance, a large oak tree being removed with the roots, that easily affected the foundation of the concrete base. I mean, what we're really talking about here is . . . *the benefit of PG&E and the safety of the people there*." (Italics added.)

[6] There was a second reason the court precluded evidence that PG&E authorized appellants to remove the Driveway Tree: even if PG&E did have the right to remove a tree from its easement for landscaping purposes, as a matter of law it had no authority to transfer that right to the Thompsons to relocate the Driveway Tree, "particularly without complying with the Conservation Easement[']s provisions that were a part of the written Trust that required written approval." In other words, regardless of what PG&E

## 2. Harmless Error

An erroneous preclusion of evidence does not compel reversal unless it is reasonably probable that the admission of the evidence would have resulted in a more favorable outcome at trial. (*Aaron v. Dunham* (2006) 137 Cal.App.4th 1244, 1253; see Evid. Code, § 354 [judgment shall not be set aside due to the erroneous exclusion of evidence unless there resulted a miscarriage of justice].) Here, even if the court had erred in precluding evidence that PG&E authorized the removal of the Driveway Tree, the error would be harmless because, as later revealed at trial, appellants' assertion that Wheeldon had provided such authorization turned out to be a falsehood.

Wheeldon testified that he never gave Peter Thompson permission to remove the Driveway Tree, he did not tell Thompson that PG&E was even going to trim that tree, and he stated instead that PG&E would likely never have to trim that tree in its lifetime. After Wheeldon testified, Thompson admitted the falsity of his statement that the oak tree was marked for topping by PG&E, and he conceded that he never talked to Wheeldon about PG&E topping it. Appellants' "saving the tree" story was a sham.

Appellants argue in their reply brief that, even though Thompson admitted at trial that *Wheeldon* did not give him permission to move the tree, he did not concede that *no one* from PG&E authorized him to move the tree, and they could have put on evidence that someone other than Wheeldon provided the authorization. Their argument rings hollow. Neither in the

---

told them, appellants were bound by the Conservation Easement's prohibitions and had no right to remove any trees from the Easement Property. We need not resolve the issue in light of our conclusion *ante* that PG&E had no right under the PG&E Easement to authorize appellants to remove trees for their landscaping purposes, and our conclusion *post* that any error in the trial court's legal analysis was harmless.

trial court nor in this court have appellants identified any evidence that PG&E authorized appellants to remove the Driveway Tree.

In their opening brief, appellants identify only one specific piece of evidence in this regard. They assert: "as explained at the hearing on the motion for a new trial, the defendants could have called *Eric Brown* of PG&E to testify, and discuss, inter alia, the voicemail he left on July 6, 2015, about PG&E's rights in the trees under the powers [sic]." (Italics added.) Appellants do not tell us what the voicemail was, what Brown would have said about it, any authority Brown had to speak on behalf of PG&E in regard to the PG&E Easement, when appellants requested the court to allow such evidence, or any offer of proof appellants made to the court during trial.

Their citation to the record takes us to the reporter's transcript of the hearing on their new trial motion, which refers to an "Exhibit 233" that apparently was marked for identification at trial but not admitted into evidence. Exhibit 233 included an email from the Trust's Simons to Eric Brown, indicating they had exchanged voicemails in late June and early July 2015 and Simons was inquiring about PG&E's ownership of trees under the power lines. That does nothing to show any authorization by PG&E to *remove* the Driveway Tree, let alone any capacity of Eric Brown to grant such authorization. Nor did appellants include Eric Brown on their witness list or mention him in opposing the Trust's in limine motion regarding PG&E's alleged authorization or, as far as we are told, at any other time during the trial testimony.

In their appellate reply brief, appellants refer to another piece of evidence, Exhibit 218-A, which included emails between Wheeldon and Peter Thompson. At trial, appellants' counsel tried to ask Thompson about the last

page of that exhibit, identified as SLT6665.[7]  Page SLT6665 contains an email from Thompson to Wheeldon stating he was moving two oak trees, and an email from Wheeldon to Thompson noting that Wheeldon had talked to Eric Hess (the Thompsons' contractor), who had explained the "scope of the work that he is going to be doing *for you* and everything sounds good." (Italics added.)  It is unclear what "scope of work" Hess mentioned to Wheeldon, but even assuming it was in line with Thompson's statement that he was moving two oak trees, the emails do not show that PG&E had granted to appellants any right PG&E might have had to move trees pursuant to the PG&E Easement.  At best, the emails suggest that Wheeldon did not care if appellants took the trees for themselves—a far cry from any authorization that could have insulated appellants from the restrictions of the Conservation Easement.

Nothing in these documents supports the idea that appellants would have done better at trial if they had been allowed to introduce evidence that they were authorized by PG&E to remove the Driveway Tree.  Nor is there any indication that appellants have any other evidence to help them.  Although not mentioned in their appellate briefs, their new trial motion referred to an "Exhibit . . . 218-B," but nothing suggests they would have ridden that document to victory either.

---

[7]     Appellants' counsel directed Thompson's attention to page SLT6665 of Exhibit 218-A and, without moving the document into evidence, asked Thompson, "What was your understanding as to what Greg Wheeldon was conveying to you at that point in time?"  The Trust's attorney objected on the grounds of hearsay, lack of foundation, and the court's in limine ruling regarding the PG&E Easement.  The court responded: "Sustained.  [¶]  It also calls for speculation.  [¶]  Please continue Mr. Gorski."  Without laying a foundation, making an offer of proof, or attempting to introduce the document into evidence, appellants' counsel moved on to a different exhibit.

24

The fact is, from the time appellants were caught moving the Driveway Tree through the time of trial, appellants had represented to the Trust and to the court that it was *"Greg" Wheeldon* who said PG&E was going to top the Driveway Tree and authorized appellants to remove it. We are not pointed to anywhere in the record when appellants stated that *anybody else* had given such authorization, and no such person is mentioned in appellants' trial brief, their witness list, their written opposition to the in limine motion, or their argument at the hearing on the admissibility of Wheeldon's evidence. The existence of such a person seems implausible, since it was *Wheeldon* to whom Peter Thompson turned when he needed someone to vouch for his story that PG&E had authorized the tree removal. And then at trial, Wheeldon testified that he did *not* tell Thompson that PG&E was going to top the tree or authorized appellants to remove it, Thompson confessed his false statement, and appellants did not present evidence or an offer of proof of anyone else who gave appellants the alleged authorization. Having observed the trial testimony, the court found that Thompson and most of appellants' witnesses were not credible, based on the court's personal observations of their demeanor. Accordingly, even if the court had erred and PG&E did have the authority under the PG&E Easement to authorize appellants to remove the Driveway Tree, there is no reasonable probability appellants would have been able to prove such authorization and done better at trial.

B. <u>Use of Wheeldon's Testimony</u>

Appellants next contend the trial court erred by allowing Wheeldon to testify about his conversations with Peter Thompson and using that evidence to find that no one at PG&E authorized appellants to relocate the Driveway Tree, particularly since they were precluded from submitting evidence that PG&E did offer such authorization. Appellants' argument, essentially, is

25

that Wheeldon's testimony was admitted only for the limited purpose of Thompson's credibility (as it related to the disputed issues of the Trust's mitigation of damages and staff costs), not for the purpose of evaluating whether an authorization by PG&E had occurred.

We need not decide this issue. As concluded *ante*, as a matter of law PG&E did not have the legal right to authorize appellants to remove the Driveway Tree. Therefore, whether the court properly found that PG&E did not *purport* to give such an authorization is beside the point. Put another way, even if the court had not found that PG&E never authorized appellants to move the Driveway Tree, or the court was legally precluded from making that finding, appellants would not have obtained a better outcome at trial. Furthermore, as also concluded *ante*, appellants have not identified any evidence they *could have* introduced to demonstrate authorization by PG&E, so any error by the court in finding no authorization, or barring such evidence, was harmless.[8]

---

[8] Appellants also assert in their statement of the issues and a heading in their opening brief that the court erred in allowing Wheeldon to testify that PG&E did not allow Peter Thompson to move trees from its easement. They do not pursue this point in the text of their briefs, focusing instead on the idea that the court erred in using Wheeldon's testimony to find that no PG&E representative had authorized the trees' removal. Any challenge to the admissibility of Wheeldon's testimony is therefore waived. At any rate, appellants have not shown an abuse of discretion in admitting Wheeldon's testimony for the limited purpose of challenging Thompson's credibility. (*Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1330 [evidence ruled inadmissible for one purpose may be relevant and admissible for another purpose]; Evid. Code, §§ 210 [relevance], 780 [credibility]; *Leader v. Cal.* (1986) 182 Cal.App.3d 1079, 1091 [admissibility of evidence for limited purpose of impeachment]; *People v. Morrison* (2011) 199 Cal.App.4th 158, 165 [evidence collateral to issues in the trial was relevant to credibility because it contradicted defendant's testimony].)

C. <u>Request for Continuance</u>

"To ensure the prompt disposition of civil cases, the dates assigned for a trial are firm." (Cal. Rules of Court, rule 3.1332(a).) "[C]ontinuances of trials are disfavored" and may be granted only upon "an affirmative showing of good cause." (Cal. Rules of Court, rule 3.1332(c).) Good cause may arise due to the "unavailability of trial counsel" because of "excusable circumstances," but the court must consider all the relevant facts and circumstances, which may include the proximity of the trial date, whether there were prior continuances, the length of the requested continuance, the availability of alternative means to address the problem, prejudice to the parties, and whether the parties stipulated to the continuance. (Cal. Rules of Court, rule 3.1332(c), (d).) We review for an abuse of discretion. (*Forthmann v. Boyer* (2002) 97 Cal.App.4th 977, 984.)

The court acted well within its discretion in denying the requested continuance based on the information Gorski provided. Gorski did not file his request until three days before trial. The trial had been postponed previously. Gorski's claimed need for the continuance was merely that a "material change" in his family circumstances would result in "substantial interference" with his ability to provide effective counsel, and that he "could not be [in court] on certain days" because he had "things going on." Acknowledging Gorski's situation, the court reiterated the general policy against postponing trial dates, noted the "lengthy history" of the case and the likelihood that changing trial dates would cause other conflicts, and observed that even without a continuance the trial would not begin for two to three more days and would be in session only four days a week until 1:30 p.m. The court offered Gorski multiple opportunities to address the court's view and express any additional concerns.

Appellants instead attack the court for not holding an in camera hearing, claiming that Welfare and Institutions Code section 827 (section 827) prevented Gorski from "presenting most of the underlying facts about his ongoing dependency proceeding," which "would have shown that he had good cause for a continuance." Appellants say the court "did not take the time to hear from Mr. Gorski *in camera*," "declined to give Mr. Gorski an opportunity to explain the specifics of his situation *in camera*," "refuse[d] to spend the necessary time to hear the relevant facts *in camera*," and "denied them a continuance without even examining the relevant evidence." In their reply brief, appellants go so far as to insist the court "abused its discretion in *refusing* to hear defense counsel Gary Gorski explain *in camera* why he had good cause for requesting a continuance, where the law *precluded him from discussing that cause in public*." (Italics added.) Appellants' fixation on an in camera hearing and section 827 misses the mark.

Appellants' aspersion that the court "refused" a request by Gorski to hold an in camera hearing misstates the record. Gorski merely averred in his declaration that he was "*willing* to explain the nature of [the dependency proceeding] in camera." (Italics added.) At no time before or during the courtroom hearing did Gorski ever *ask* to be heard in camera, or explain what type of details could be revealed in camera, despite the court's repeated invitation for him to present his position. Indeed, when asked, "Do you wish to be heard further, Mr. Gorski, on your Motion to Continue this trial?" Gorski replied, "No, Your Honor. You addressed the issues. You know where I stand." The court did not abuse its discretion in denying the continuance without an in camera proceeding.

Furthermore, appellants' argument concerning an in camera hearing and section 827 is unavailing—for several reasons. First, if indeed Gorski

28

wanted to tell the court more about the dependency proceedings, appellants have not shown that he needed an in camera hearing (or in camera review) to do so. Section 827 limits the inspection and dissemination of a juvenile dependent's *case file*. It allows "[c]ourt personnel" to inspect the case file and receive a copy of it (§ 827, subd. (a)(1)(A), (a)(5)), and the case file may be disclosed to others and attached to another document with approval from the juvenile court (§ 827, subd. (a)(1)(Q), (a)(4)). (See Cal. Rules of Court, rule 5.552; Super. Ct. Sonoma County, Local Rules, rule 10.17.) Even if this limited the dissemination of details in a public courtroom, appellants have demonstrated that the statute did *not* necessitate an in camera hearing for disclosure of the facts they now say the court should have heard, because *appellants have revealed* all those details in public court documents they filed after appellants lost at trial, including Gorski's April 2019 declaration, his declaration in support of the new trial motion, and appellants' briefs in this court.

Second, there was no need for an in camera hearing to explain the nature of the dependency proceeding, because the nature of the dependency proceeding was not at issue. What mattered was the *impact* the dependency order had on Gorski's ability to start the trial in this case. Nothing in section 827, or the absence of an in camera hearing, precluded Gorski from telling the court what he has now alleged, such as his inability to stay in Santa Rosa for trial, his need to commute hours each day, the limitations on his time for preparing witnesses, and the like—even though it was this commute that Gorski later called "the single most significant factor in impeding my ability to provide effective assistance of counsel." [9] In the words of appellants'

---

[9] Appellants say the "confidential details" they are unable to disclose in their opening brief are the "names of the mother or daughter, the nature of

29

subsequent counsel, Richard Freeman—one of their attorneys in this appeal—at the hearing on the new trial motion: "I'm sure that [Gorski] could have, should have, maybe should have apprised [the trial judge] more specifically of what he was dealing with in connection with that motion to continue trial. And I can't speculate as to why he didn't."

Third, even if an in camera hearing *had* been held, appellants do not show that Gorski would have disclosed to the trial court the facts now included in their appellate briefs. Gorski did not state in his declarations what he would have said in camera. To the contrary, Gorski told the court after the trial was over, "Initially, *I did not realize*, nor could I, the impact that the sudden and unexpected change would have on my ability to represent the Thompsons in the [t]rial." (Italics added.)

Finally, even if the trial court had held an in camera hearing *and* been apprised of all of the facts appellants now present, there is no reasonable probability that appellants would have obtained a better outcome in the trial. The trial had been set for July 27. Gorski requested a continuance of just five court days and at the hearing represented that he would be ready for trial on August 3 or 6. As the court explained, even without granting the continuance, trial did not begin until August 1, when the court made its in limine ruling that was correct as a matter of law. Appellants fail to show that if the court had started the 19-day trial on August 3 instead of August 1, there is a reasonable chance the trial would have turned out any better for them. Appellants fail to establish error.[10]

the abuse, the specific medical treatments, or the types of therapy, family services, and social services involved."

[10]     In footnote 5 of appellants' opening brief, appellants assert that the Final Statement of Decision makes conclusions about the application of the conservation easement statute to third parties, but this court need not rule

## III.  DISPOSITION

The judgment is affirmed.

---

on that issue.  The Trust responds that the court properly enforced the easement against Henstooth Ranch LLC, even though it was not a party to the easement.  Amici comment on the argument as well.  But because appellants did not provide substantial argument supported with citation to authority in their opening brief (Cal. Rules of Court, rule 8.204(a)), and have not even urged us to consider the matter, we do not decide the issue.  We therefore affirm the judgment without there being any challenge to the trial court's ruling on this point.

_____

NEEDHAM, .J.

We concur.

_____

SIMONS, Acting P.J.

_____

REARDON, J. *

*Sonoma Land Trust v. Thompson* / A157721

---

* Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.